## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**GOUYEN BROWN LOPEZ,**
9340 East Sleepy Hollow Road
Mesa, AZ 85207

**SINETTA LOPEZ, on behalf of herself and her minor child L.B.,**
9340 East Sleepy Hollow Road
Mesa, AZ 85207

**NOMIE BROWN,**
175 Roja Drive
Globe, AZ 85501

**ANGELA KINSEY, on behalf of herself and her minor children V.K. and M.K.,**
8734 North Ninth Avenue
Phoenix, AZ 85021

      *Plaintiffs*,

v.

**UNITED STATES OF AMERICA**,
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530

**UNITED STATES DEPARTMENT OF AGRICULTURE,**
U.S. Department of Agriculture
1400 Independence Ave., SW
Washington, D.C. 20250-0003

**UNITED STATES FOREST SERVICE,**
U.S. Department of Agriculture
1400 Independence Ave., SW
Washington, D.C. 20250-0003

**BROOKE ROLLINS,**
U.S. Department of Agriculture
1400 Independence Ave, SW
Washington, D.C. 20250-0003

Civil Action No. 1:25-cv-02408

**COMPLAINT**
(Jury Requested)

**TOM SCHULTZ,**
U.S. Department of Agriculture
1400 Independence Ave., SW
Washington, D.C. 20250-0003

  *Defendants*.

**COME NOW** Plaintiffs and plead as follows:

## INTRODUCTION

1.    This case involves the federal government's plan to destroy a long-recognized Native American sacred site in violation of federal statutes and the Constitution. Plaintiffs are Apache girls and women who worship at that site and will be unable to practice and pass down their religion if the site is destroyed. Because the government's plan to destroy the site goes into effect in just 26 days, Plaintiffs seek a preliminary injunction by August 15, 2025.

2.    For centuries, Western Apaches have worshipped at a sacred site called *Chí'chil Bilda-goteel*, or Oak Flat. Oak Flat is the Apaches' direct corridor to the Creator and the locus of sacred rituals that are uniquely tied to that place and cannot be replicated elsewhere.

3.    Since the mid-1900s, the government has recognized the significance of Oak Flat, preserving it from mining and protecting Apache rituals that take place there. But because a large copper deposit was discovered beneath Oak Flat, the government has now decided to transfer the site to Resolution Copper, a foreign-owned mining company, for the express purpose of creating a mine that will destroy the site—swallowing it in a massive crater and ending sacred Apache rituals forever.

4.    The government admits that the mine will physically destroy Oak Flat: the impacts will be "immediate, permanent, and large in scale"; all "public access" to the site will be "lost"; nothing can "replace or replicate the tribal resources and [traditional cultural properties] that would be destroyed"; and Apaches will never again be able to carry out their religious practices at Oak Flat. USDA, 3 *Final Environmental Impact Statement: Resolution Copper Project & Land Exchange* 892 (June 2025) (*i.e.*, 3-EIS-892), https://www.resolutionmineeis.us/documents/final-eis; 1-EIS-153, 327.

5.    The government also admits that "alternative underground mining methods" "could physically be applied" to recover the copper without cratering the surface of Oak Flat. 4-EIS-F-3. However, the government has declined to require these alternatives, or even consider them, based

1

on Resolution's claim that these alternatives would have "higher operational costs" and "reduce the amount of ore that could be profitably mined." *Id.*

6.     In other words, the government has authorized the complete physical destruction of an irreplaceable Native American sacred site solely to pad the bottom line of a foreign-owned mining company.

7.     On June 20, 2025, the Forest Service published its Final Environmental Impact Statement (EIS) for the proposed mine—the final agency action setting in motion the transfer and destruction of Oak Flat. Publication of the EIS triggers a 60-day deadline for the government to transfer title to Oak Flat to Resolution, which the government plans to do, absent judicial intervention, on August 19, 2025. Resolution can then immediately begin degrading the surface of Oak Flat.

8.     As explained below, the government's decision to transfer and destroy Oak Flat violates multiple federal laws and the Constitution.

9.     First, it violates the Religious Freedom Restoration Act (RFRA). RFRA provides that the federal government may not "substantially burden" a person's religious exercise unless the government demonstrates that imposing that burden is "the least restrictive means of furthering" a "compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b). By its terms, RFRA applies to "all Federal law," *id.* § 2000bb-3(a), including laws disposing of federal real property, and it expressly defines the "exercise of religion" to include "[t]he use … of real property for the purpose of religious exercise," *id.* §§ 2000bb-2, 2000cc-5(7)(B). Six federal appellate judges and two Supreme Court Justices have already opined that destroying Oak Flat would substantially burden Western Apaches' religious exercise. *See Apache Stronghold v. United States*, 145 S. Ct. 1480, 1480 (2025) (Gorsuch, J., dissenting from denial of certiorari) (citing *Apache Stronghold v. United States*, 101 F.4th 1036, 1131 (9th Cir. 2024) (en banc) (Murguia, C.J., dissenting)); *Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting). Over the course of years of defending the land transfer, the government has never even attempted to show that destroying Oak Flat is the least restrictive means of furthering a compelling governmental interest. Thus, the destruction of Oak Flat violates RFRA.

10.    Second, the destruction of Oak Flat violates the First Amendment right of Apache parents to direct the religious upbringing of their children. In *Mahmoud v. Taylor*, the Supreme Court held that "the right of parents 'to direct the religious upbringing of their' children would be an empty promise if it did not follow those children" onto government property. 145 S. Ct. 2332, 2351 (2025). Accordingly, the Court held that reading LGBTQ-inclusive storybooks to children in public schools, without notifying parents or allowing the children to opt out, posed "'a very real threat of undermining' the religious beliefs that the parents wish to instill in their children." *Id.* at 2355. Here, the government is not just "subtly" undermining what Apache parents seek to instill in their children, *id.* at 2353; it is destroying a sacred site that is uniquely irreplaceable and necessary to the Apache faith, without which Apache parents will forever be prevented from initiating their children in core Apache religious ways. This is nothing less than "the destruction of [a religious] community"—which all nine Justices in *Mahmoud* agreed was unconstitutional. *Id.* at 2392 & n.8 (Sotomayor, J., dissenting).

11.    Third, the destruction of Oak Flat violates the Free Exercise Clause even aside from *Mahmoud*, because the government's actions are neither neutral toward religion nor based on a generally applicable law. Far from being the unanticipated, incidental effect of a religion-blind law, the government has made a calculated, discretionary, and individualized decision about a single piece of land—intentionally favoring the secular use of copper mining over religious use by Apaches. That sort of discretionary decision to favor secular over religious conduct triggers strict scrutiny, which the government cannot satisfy.

12.    Fourth, the EIS violates the National Environmental Policy Act (NEPA). A 2023 amendment to NEPA provides that an EIS "shall not exceed 150 pages," except for projects of "extraordinary complexity," in which case an EIS "shall not exceed 300 pages." Here, the EIS is over 1,000 pages—plainly violating the statute. Even then, the EIS is also woefully underinclusive. 42 U.S.C. § 4336a(e)(1)(A). While providing many pages of useless information, the EIS fails at the most basic task of considering reasonable alternatives to the proposed agency action, including

alternative mining methods that would be far less destructive of Oak Flat. 42 U.S.C. § 4332(C)(iii), (F).

13. Fifth, the transfer violates the National Historic Preservation Act (NHPA). The NHPA requires the government to identify historical sites that may be harmed by federal projects, and to mitigate and avoid harm to those sites. 54 U.S.C. § 306108; 36 C.F.R. § 800.1(a). Oak Flat is unquestionably a site of immeasurable historical value, as evidenced by (*inter alia*) its listing in the National Register of Historic Places. Yet the government has failed to follow the processes set out in the NHPA. It has pushed the transfer forward without the support of the NHPA-created Advisory Council on Historical Preservation (ACHP) and has ignored the alternative approaches suggested by the ACHP that would prevent subsidence and mitigate harm to the 43 historical sites that will be destroyed by the mine. This disregard for Oak Flat's historical value violates the NHPA.

14. This nation has a tragic history of destroying Apache lives and land for the sake of mining interests. The history should not—indeed, must not—be repeated here. Multiple federal laws protect Apache religious practices at Oak Flat. This Court should enforce those laws and enjoin the transfer and destruction of Oak Flat.

## PARTIES

15. Plaintiff Gouyen Brown is an Apache woman who engages in religious practices at Oak Flat. She had her coming-of-age Sunrise Ceremony at Oak Flat, and Oak Flat is essential to her ongoing religious exercise and her identity as an Apache woman.

16. Plaintiff Sinetta Lopez is an Apache woman and mother who engages in religious practices at Oak Flat. Her adult daughter, Gouyen Brown, had her Sunrise Ceremony at Oak Flat. Her 11-year-old minor daughter also plans to have her Sunrise Ceremony at Oak Flat. Engaging in religious practices with her daughters at Oak Flat is essential to how she brings up her daughters in Apache religious ways. It is also essential to her own religious exercise and her identity as an Apache woman.

17. Plaintiff Nomie Brown is an Apache woman who had her coming-of-age Sunrise Ceremony at Oak Flat. Oak Flat is essential to her ongoing religious exercise and her identity as an Apache woman.

18. Plaintiff Angela Kinsey is an Apache woman and mother who engages in religious practices at Oak Flat. Her seventeen-year-old minor daughter had her coming-of-age ceremony at Oak Flat. She also hopes that her younger, four-year-old minor daughter can have her coming-of-age ceremony at Oak Flat. Engaging in religious practices with her daughters at Oak Flat is essential to how she brings up her daughters in Apache religious ways. It is also essential to her own religious exercise and her identity as an Apache woman.

19. Defendant United States of America ("United States" or "U.S.") is being sued for the wrongful acts of its representatives, employees, and agencies. The United States is further implicated by and through the actions, policies, patterns, practices, and customs of the other Defendants and its policymakers, agents, and officers.

20. Defendant United States Department of Agriculture ("USDA") is the federal department responsible for the management of the United States Forest Service and national forests, including the Tonto National Forest, in which Oak Flat lies.

21. Defendant United States Forest Service ("Forest Service") is a federal agency of the USDA. By statutory authority and the agency's own regulations and policies, the Forest Service is also responsible for implementing the NHPA, NEPA, and other land management laws and regulations pertaining to actions and decisions about lands administered by Defendants. The Forest Service has an obligation to consult and coordinate with Native American tribes and other governmental units when making findings and determinations under Section 106 of the NHPA regarding the effects of Forest Service-approved projects on cultural resources. Importantly, the Forest Service has a fiduciary duty under the federal trust responsibility to consult and coordinate with tribes and protect tribal properties, including traditional cultural properties and sacred sites, when approving and assessing the effects of projects. Thus, the Forest Service is, by law,

responsible for the management and actions undertaken with respect to the public lands at issue here.

22.   Defendant Brooke Rollins is the Secretary of Agriculture and the chief officer for the USDA. Rollins is responsible for the supervision of the Forest Service and the implementation and enforcement of applicable law in this proceeding. Rollins is sued in her official capacity.

23.   Defendant Tom Schultz is the Chief of the Forest Service. Schultz is charged with the primary duties and responsibilities of the United States and the Forest Service, and those as trustee and fiduciary regarding management of lands and other assets under Forest Service control or responsibility. Schultz is sued in his official capacity.

## JURISDICTION AND VENUE

24.   This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because Plaintiffs' claims arise under the Constitution and laws of the United States.

25.   Venue lies in this district under 28 U.S.C. § 1391(e) because it is a judicial district in which "a defendant in the action resides" and where "a substantial part of the events or omissions giving rise to the claim occurred."

26.   The challenged agency actions are subject to judicial review and authority pursuant to 5 U.S.C. §§ 702, 704, 706.

## FACTUAL ALLEGATIONS

### Oak Flat

27.   For centuries, Western Apaches and other tribes have worshipped at a sacred site called *Chí'chil Bildagoteel* ("a broad flat of Emory oak trees") or Oak Flat.

28.   Oak Flat is located within a 6.7-square-mile traditional cultural property about three miles east of present-day Superior, Arizona, between Apache Leap on the west and Ga'an Canyon (called Devil's Canyon by non-Indians) on the east.

29.   The terrain is characterized by old-growth oak groves, grassy basins, boulder fields, jagged cliffs, and perennial waters used by songbirds, mountain lions, foxes, bears, and deer.

30.    The site also includes sacred springs, burial sites, and a singular concentration of archaeological sites testifying to its persistent use for the past 1,500 years.

31.    Sometimes described as the birthplace of Western Apache religion, Oak Flat figures prominently in Western Apache cosmology as a unique dwelling place of spiritual beings called Ga'an, who are holy spirits and messengers between the Creator and human beings.

32.    As the dwelling place of the Ga'an, Oak Flat is a direct corridor to the Creator and is uniquely endowed with holiness and medicine. As such, Oak Flat is the site of religious ceremonies that are tied to that place and cannot be replicated elsewhere.

33.    As one scholar has observed: "For centuries, Western Apaches have maintained close ties to [Oak Flat] as a place to collect traditional foods and medicines, a place of ancestral origins, a place where holy beings reside, and the only place where certain prayers, offerings, and ceremonies can be conducted." Tisa Wenger, *Fighting for Oak Flat: Western Apaches and American Religious Freedom*, 39 J.L. AND RELIGION 247, 248 (2024) ("Wenger").

34.    Ceremonies that occur at Oak Flat include sweat lodge ceremonies for boys entering manhood, Holy Ground Ceremonies for blessing and healing, the Sunrise Ceremony marking an Apache girl's entry into womanhood, and the gathering of sacred medicine plants, animals, and minerals essential to those ceremonies.

35.    The Holy Ground Ceremony is a blessing and a healing ceremony that a medicine man conducts for people who are sick or seek guidance. It takes place at Oak Flat as a holy place for healing, and it draws on holy medicinal plants available only at Oak Flat. It has been performed in its current form at Oak Flat for at least 100 years and reflects and builds on much older practices.

36.    The Holy Ground Ceremony traces back at least to the 1920s and the Apache prophet Silas John, who drew on much older traditions. Silas John's Holy Ground movement "very clearly included ceremonies at *Chi'chil Biłdagoteel* [Oak Flat]." Wenger at 257-58. By "selecting sites that Apaches already considered sacred, the Holy Ground movement secured credibility in Indigenous terms and deepened the sanctity of the places where its ceremonies were held." *Id.* at 259–60.

7

37.    The federal government actively suppressed the Holy Ground movement by forbidding Silas John's dances and jailing him. *Id.* at 259. Nevertheless, some families still held Holy Ground ceremonies at Oak Flat in the late 1940s or early 1950s. *Id.* And they continue to do so today.

38.    The Sunrise Ceremony requires months of planning, takes several days to celebrate, and is often attended by hundreds of tribal members. To prepare, the girl gathers plants from Oak Flat and speaks to the spirit of Oak Flat, expressing gratitude for its resources. Her godmother dresses her in the essential tools of womanhood, and tribal members surround her with singing, dancing, and prayer. In the night, the Ga'an enter Apache men called crown dancers. The Ga'an bless the girl, who joins their dance.

39.    On the final day, one of the Ga'an dancers paints the girl with white clay taken from the ground at Oak Flat, molding her into the woman she is going to be. When her godmother wipes the clay from her eyes, she is a new woman forever imprinted with the spirit of Oak Flat.

40.    Oak Flat is also the site of several natural springs, which are rare in this arid region, and which are sources of spiritual power for Apaches.

41.    One example is *Tú Nahikaadi* (Dripping Spring), a cave with a dripping spring, which has a unique role in Apache oral tradition.

42.    According to Apache tradition, a great flood scoured the world, and the matriarch of the Apache people, Changing Woman, survived the flood and took refuge in a cave with a dripping spring. Wenger at 250–51. She emerged alone into this world, and her children, conceived with the Sun, received guidance from the Ga'an on how to live in this land. *Id.*

43.    Western Apaches continue to visit Dripping Spring for religious rituals, and the Apache girl in a Sunrise Dance embodies Changing Woman as she dances her way to womanhood.

44.    Oak Flat is also the site of *Tséyaa Gogeschin* (translated as Written or Painted under the Rocks), a large rock overhang with ancient pictographs and petroglyphs—rock art that holds special meaning for Apache medicine people and provides a tangible, irreplaceable connection to Apache ancestors. The Chairman of the San Carlos Apache Tribe has described this artwork as "the footprints and the very spirit of our ancestors," akin to "the Western Wall in Jerusalem, St.

Peter's Basilica in Vatican City, or Angor [sic] Wat in Cambodia. This is why I call Oak Flat the Sistine Chapel of Apache religion." 6-EIS-U-9.

*Plaintiffs' religious practices*

45.   The Plaintiffs in this case include Apache women and girls whose religious practices center on Oak Flat and who would be unable to continue their religious practices if Oak Flat is destroyed.

46.   Plaintiff Gouyen Brown had her Sunrise Ceremony at Oak Flat. During that ceremony, she experienced a profound spiritual connection with the Creator, with the Ga'an, with Mother Earth, and with her ancestors. It is where she became a new woman. She continues to return to Oak Flat to pray, gather medicine, and participate in religious ceremonies. She hopes and intends that her own children will be able to connect with the Creator at Oak Flat, and that her daughters will be able to have their Sunrise Ceremonies at Oak Flat. If Oak Flat is destroyed, she would be devastated. She would be unable to continue core religious practices and unable to bring up her children in the Apache religious ways.

47.   Plaintiff Sinetta Lopez is an Apache woman and Gouyen's mother. She grew up coming to Oak Flat with her mother and grandmother, collecting acorns, praying, and participating in sacred ceremonies there. Oak Flat is central to her religious practices. As a single mother, Oak Flat is central to how she brings up her daughters in the Apache way.

48.   Sinetta also has a minor daughter, L.B., who is named after an Apache warrior and prophet who escaped from imprisonment on the San Carlos Reservation and fought alongside Geronimo. Sinetta's minor daughter has grown up at Oak Flat and has had dreams and encounters with spirits at Oak Flat. She plans to have her Sunrise Ceremony there and remain connected with the Creator and with her ancestors through sacred ceremonies at Oak Flat.

49.   Plaintiff Nomie Brown is an Apache woman who had her coming-of-age Sunrise Ceremony at Oak Flat. That ceremony fundamentally changed her life, and she continues to return to Oak Flat to engage in prayer and religious ceremonies there. Oak Flat is essential to her ongoing religious exercise and her identity as an Apache woman.

50. Plaintiff Angela Kinsey is an Apache woman and mother who engages in religious practices at Oak Flat. She grew up coming to Oak Flat with her grandmother and has participated in many religious ceremonies at Oak Flat, including serving as a godmother in a Sunrise Ceremony. She has two minor daughters whom she continues to take to Oak Flat to show them where they came from and to pass on Apache traditions and religious ways. Oak Flat is the place where she is uniquely able to connect with the Creator.

51. Angela's older minor daughter, V.K., had her coming-of-age ceremony at Oak Flat. She has attended many ceremonies at Oak Flat, and attending and participating in those ceremonies is an essential part of her religious practices and identity as an Apache woman.

52. Angela's younger minor daughter, M.K., is four years old. Angela hopes and intends that M.K. will be able to have her coming-of-age ceremony at Oak Flat.

53. For Plaintiffs, Oak Flat in its entirety is a sacred and holy site. Oak Flat's protection is essential for the continued practice of Apache religious and cultural ways, and they oppose the plan to violate the integrity of Oak Flat through mining.

***The government takes Oak Flat***

54. Oak Flat was Apache land before the United States existed.

55. Beginning in the 1500s, other nations made claims on the area, including Spain and, later, Mexico.

56. The United States first gained an interest in the area in 1848, after the Mexican-American War, when Mexico ceded its claim to the area in the Treaty of Guadalupe Hidalgo.

57. In 1852, to secure peace with the Apaches, the United States entered the Treaty of Santa Fe with several Apache chiefs. In it, the United States promised to settle the Apaches' territorial boundaries and pass and execute laws conducive to their prosperity and happiness.

58. Although the government failed to carry out its obligation to settle territorial boundaries formally, the earliest map of the area, prepared by the Smithsonian Institution in 1899, shows Oak Flat as Apache territory, not belonging to the United States.

59.    Shortly after the 1852 Treaty, settlers and miners entered the area over Apache opposition, and U.S. soldiers and civilians repeatedly massacred Apaches. John R. Welch, *Earth, Wind, and Fire: Pinal Apaches, Miners, and Genocide in Central Arizona, 1859-1874*, 7 SAGE Open, Oct.-Dec. 2017, https://journals.sagepub.com/doi/epub/10.1177/2158244017747016 ("Welch").

60.    In 1862, U.S. Army General James Carleton ordered Apache men to be killed wherever found. *Id.* at 7.

61.    When miners discovered gold and silver nearby, General Carleton ordered the Apaches' "removal to a Reservation" or "utter extermination" to protect "all those who go to the country in search of precious metals." *Id.* at 8.

62.    By 1874, the government had forced 4,000 Apaches onto the San Carlos Reservation— nicknamed "Hell's 40 Acres" because it was a barren wasteland.

63.    In 1883, the U.S. Commissioner of Indian Affairs issued the Code of Indian Offenses, prohibiting traditional Native American religious practices on pain of imprisonment. Hiram Price, *Rules Governing the Court of Indian Offenses*, Department of the Interior, Office of Indian Affairs, at 4–5 (Mar. 30, 1883).

64.    The government also forcibly removed hundreds of Apache children from their families, sending them to boarding schools aimed at rooting out their "savagism" and converting them to Christianity. David Wallace Adams, *Education for Extinction: American Indians and the Boarding School Experience, 1875-1928* 6 (1st ed. 1995).

65.    After decades of conflict over their ancestral lands, the Chiricahua Apaches, led by Geronimo, surrendered in 1886 and agreed to be detained for two years in exchange for the return of their land. Gilbert King, *Geronimo's Appeal to Theodore Roosevelt*, Smithsonian Magazine, Nov. 9, 2012, https://www.smithsonianmag.com/history/geronimos-appeal-to-theodore-roosevelt-117859516/.

66.    But the government broke this promise, too. Instead, it held them prisoner for 23 years and eventually confined them to the San Carlos Reservation. Native Voices, *Timeline, 1886: Apache armed resistance ends; Geronimo surrenders*, U.S. National Library of Medicine.

67.    The government admits that Oak Flat is "part of the traditional territories of the Western Apache," who "lived on and used the resources of these lands"; that the government took Oak Flat "by force 150 years ago"; and that because of the government's actions, Western Apaches "lost large portions of their homelands, including Oak Flat, and today live on lands that do not encompass places sacred to their cultures." 3-EIS-873–75.

68.    Starting in the 1900s, the government took steps to protect Oak Flat.

69.    In 1905, the government created the Tonto National Forest, which includes Oak Flat.

70.    In 1955, President Eisenhower reserved part of Oak Flat to protect it from mining. 20 Fed. Reg. 7319, 7336-37 (Oct. 1, 1955).

71.    In 1971, President Nixon renewed the protection. 36 Fed. Reg. 18,997, 19,029 (Sep. 25, 1971).

72.    As recently as 2016, the National Park Service placed Oak Flat in the National Register of Historic Places, recognizing "that *Chí'chil Biłdagoteel* is an important feature of the Western Apache landscape as a sacred site, as a source of supernatural power, and as a staple in their traditional lifeway." *Chí'chil Biłdagoteel Historic District, Traditional Cultural Property, National Register of Historic Places Registration Form (NPS Form 10-900)* at 8, National Park Service (Jan. 2016).

### Resolution Copper lobbied for a land transfer

73.    In 1995, a large copper deposit was discovered 4,500 to 7,000 feet beneath Oak Flat.

74.    In 2004, two large multinational mining companies, Rio Tinto and BHP, formed a joint venture called Resolution Copper and began lobbying Congress to transfer Oak Flat so Resolution could mine the deposit.

75.    Between 2005 and 2013, Congress considered at least twelve standalone bills to transfer Oak Flat to Resolution. Each failed.

76. Lacking congressional support for a standalone bill, Resolution and its allies tried a different tack.

77. Each year, Congress passes the National Defense Authorization Act (NDAA), which is necessary legislation to fund the military. In 2014, the NDAA was 698 pages long and authorized hundreds of billions of dollars in defense spending. *See* Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, 128 Stat. 3292. At the last minute, Senators McCain and Flake attached to that bill the land-transfer provision—called the "Southeast Arizona Land Exchange and Conservation Act"—without a separate vote or debate. The land-transfer provision then passed as Section 3003 of the NDAA. § 3003, 128 Stat. 3732–3741.

78. Section 3003 authorizes the Secretary of Agriculture to transfer title to approximately 2,422 acres of Forest Service lands, including Oak Flat, to Resolution, in exchange for other parcels of land owned by Resolution scattered elsewhere in Arizona. § 3003(b)(2), (b)(4), (c)(1), (d)(1), *id.*, at 3732–3737.

79. Section 3003 also revokes the orders by Presidents Eisenhower and Nixon protecting Oak Flat. § 3003(i)(1)(A), *id.*, at 3740.

80. Section 3003 instructs that, before conveying any federal land, the Secretary must "prepare a single environmental impact statement under the National Environmental Policy Act [(NEPA)] which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." § 3003(c)(9)(B), *id.*, at 3735–3736.

81. Section 3003 also requires the Secretary to "engage in government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange." § 3003(c)(3)(A), *id.*, at 3733. Following consultation with the Indian tribes, the Secretary must consult with Resolution "and seek to find mutually acceptable measures

to—(i) address the concerns of the affected Indian tribes; and (ii) minimize the adverse effects on the affected Indian tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper under this section." § 3003(c)(3)(B), *id.*, at 3733.

82.   Once the Secretary publishes the EIS, Section 3003 provides that "the Secretary shall convey all right, title, and interest of the United States" in Oak Flat "to Resolution Copper" within "60 days." § 3003(c)(10), *id.*, at 3736.

### *Resolution Copper's mine will destroy Oak Flat*

83.   The government initially published an EIS on January 15, 2021, but withdrew it a few weeks later, stating that it needed additional "time" to "fully understand concerns raised by Tribes." USDA, Resolution Copper Project & Land Exchange Environmental Impact Statement: Project Update (Feb. 21, 2023), https://www.resolutionmineeis.us/.

84.   Before publishing the EIS, the government failed to coordinate with the ACHP in the production of a plan to mitigate harm to Oak Flat's historical features.

85.   Due to this failure, the ACHP submitted comments in March 2021 that included suggestions to which the agencies were required to respond.

86.   The government declined to adopt the ACHP's suggestions in a letter issued in April 2025.

87.   The government republished the EIS on June 20, 2025.

88.   The EIS confirms that the mine will destroy Oak Flat.

89.   The copper is located between 4,500 and 7,000 feet below Oak Flat's surface. To mine it, Resolution will use a technique called panel caving, which involves tunneling beneath the ore, fracturing it with explosives, and removing it from below.

90.   This method is cheaper than other feasible mining techniques but far more destructive of Oak Flat's surface.

91.   Once the ore is removed, approximately 1.37 billion tons of toxic waste ("tailings") will need to be stored forever. This will permanently bury or otherwise destroy many prehistoric and

historic cultural artifacts, including human burials. Oak Flat itself will collapse ("subside") into a crater almost 2 miles across and 800 to 1,110 feet deep.

92.   The EIS admits that the impacts of the mine will be "immediate, permanent, and large in scale"; that all "public access" to the site will be "lost"; and that nothing can "replace or replicate the Tribal resources and [traditional cultural properties] that would be destroyed." 1-EIS-153; 3-EIS-892.

93.   Among other things, the mine will destroy the places used for Sunrise, Holy Grounds, and other sacred ceremonies; old-growth oak groves and sacred medicinal plants; sacred springs, including Dripping Spring; burial grounds; and ancient religious and cultural artifacts, including the centuries-old petroglyphs of *Tséyaa Gogeschin*.

94.   The destruction of Oak Flat will terminate the Apaches' access to the site, destroy the foods, medicines, springs, artifacts and locations that are essential to their religious practices, and make it physically impossible for the Apaches to ever engage in their core religious practices again.

### Impacted groups challenged the 2021 EIS

95.   When the government initially published an EIS in 2021 (before withdrawing it a few weeks later), three lawsuits were filed challenging the adequacy of the EIS and the legality of the land transfer. *Apache Stronghold v. United States*, No. 2:21-cv-50 (D. Ariz. Jan. 12, 2021); *San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 2:21-cv-68 (D. Ariz. Jan. 14, 2021); *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, No. 2:21-cv-122 (D. Ariz. Jan. 22, 2021).

96.   Two of those lawsuits focused on the adequacy of the 2021 EIS and were stayed when the EIS was withdrawn on March 1, 2021. Order, *San Carlos Apache Tribe*, No. 2:21-cv-68 (D. Ariz. Mar. 23, 2021), ECF No. 47; Order, *Ariz. Mining Reform Coal.*, No. 2:21-cv-122 (D. Ariz. Mar. 16, 2021), ECF No. 35.

97.   One of the lawsuits challenged the legality of the land transfer under the Religious Freedom Restoration Act and First Amendment and sought an emergency injunction. The district court declined to enjoin the land transfer. *Apache Stronghold*, No. 2:21-cv-50, 2021 WL 689906 (D. Ariz. Feb. 22, 2021). The en banc Ninth Circuit affirmed by a sharply divided, 6-5 vote. *Apache*

*Stronghold*, 101 F.4th 1036. The Supreme Court declined to grant certiorari on May 27, 2025, over a dissenting opinion from Justice Gorsuch, joined by Justice Thomas, *Apache Stronghold*, 145 S. Ct. 1480, and is currently considering a petition for rehearing asking it to reconsider the denial of certiorari, *Apache Stronghold v. United States*, No. 24-291 (U.S. petition for rehearing filed June 23, 2025).

### *The government issued a new EIS and sped ahead with the land transfer*

98.    On March 20, 2025, President Trump issued Executive Order 14241, titled *Immediate Measures to Increase American Mineral Production*. Exec. Order No. 14241, 90 Fed. Reg. 13,673 (Mar. 20, 2025). Executive Order 14241 states that the United States must "take immediate action to facilitate domestic mineral production to the maximum possible extent" and orders agencies to "identify priority projects that can be immediately approved or for which permits can be immediately issued." *Id.* §§ 1, 3.

99.    On June 20, 2025, the Forest Service published a new final EIS.

100.    After publication of the EIS, the government must convey Oak Flat to Resolution within 60 days, which the government has represented that it intends to do on August 19, 2025.

## CLAIMS

## COUNT I

### Violation of the Religious Freedom Restoration Act
### 42 U.S.C. § 2000bb *et seq.*

101.    Plaintiffs incorporate by reference all preceding paragraphs.

102.    Under RFRA, "Government shall not substantially burden a person's exercise of religion" unless it satisfies strict scrutiny. 42 U.S.C. § 2000bb-1(a)-(b).

103.    Strict scrutiny requires that the government "demonstrates that application of the burden to the person–(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b); *Singh v. Berger*, 56 F.4th 88, 92 (D.C. Cir. 2022).

104. RFRA broadly defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4) (citing 42 U.S.C. § 2000cc-5).

105. RFRA also defines the "exercise of religion" to include "[t]he use ... of real property" for religious exercise. *Id.* §§ 2000bb-2(4), 2000cc-5(7)(B).

106. A compelling interest includes "only those interests of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). And the least-restrictive-means standard is "exceptionally demanding." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). To pass the least-restrictive-means test, the government must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion" by the religious objector. *Id.*

107. Plaintiffs exercise their religion by visiting, praying, and participating in sacred ceremonies that are uniquely tied to Oak Flat and cannot be replicated elsewhere. Plaintiffs intend to continue in their religious exercise at Oak Flat through their ongoing, imminent, active participation in ceremonies and religious observances at Oak Flat.

108. The transfer and destruction of Oak Flat substantially burdens Plaintiffs' exercise of religion.

109. Denying Plaintiffs access to Oak Flat substantially burdens Plaintiffs' religious exercise.

110. Physically destroying Plaintiffs' sacred site substantially burdens Plaintiffs' religious exercise.

111. Interfering with Plaintiffs' religious ceremonies at Oak Flat substantially burdens Plaintiffs' religious exercise.

112. Completely preventing Plaintiffs' exercise of religion at Oak Flat substantially burdens Plaintiffs' religious exercise.

113. Defendants cannot satisfy strict scrutiny.

## COUNT II

**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Prohibition of Free Exercise**

114. Plaintiffs incorporate by reference all preceding paragraphs.

115. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

116. Under the Free Exercise Clause, government action burdening religion is protected from strict scrutiny only if it constitutes a valid and neutral law of general applicability.

117. Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny.

118. The government's action here burdens Plaintiffs' religious exercise.

119. The government's action here is neither neutral nor generally applicable.

120. The government's action is neither neutral nor generally applicable because it disproportionately affects the religious exercise of Native Americans and almost no others, and because it was enacted with hostility toward Plaintiffs' religious exercise.

121. The government's action is neither neutral nor generally applicable because it involves a calculated, discretionary, and individualized decision about a single piece of land, and it intentionally favors the secular use of copper mining over religious use by Apaches.

122. The government's action cannot satisfy strict scrutiny.

## COUNT III

**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Burden on the Right to Direct the Religious Upbringing of Children**

123. Plaintiffs incorporate by reference all preceding paragraphs.

124. The government's actions are subject to strict scrutiny under the Free Exercise Clause when they "substantially interfer[e] with the religious development" of children. *Mahmoud*, 145 S. Ct. at 2356 (quoting *Yoder*, 406 U.S. at 218).

18

125. When the government's actions impose an "objective danger," or a "very real threat of undermining" parents' religious exercise, they impose a burden on religious exercise. *Id.* at 2349, 2355.

126. The relevant religious exercise here is the plaintiff parents' ability to raise their children in accordance with their Apache religious beliefs, which includes worship, prayer, gathering medicine, and holding religious ceremonies at Oak Flat.

127. By transferring and destroying Oak Flat, the government is cutting off Apache parents from ever engaging in core religious practices that are essential to their children's religious development. This not only poses an "objective danger" or "very real threat of undermining" Plaintiffs' religious exercise, but also renders it altogether physically impossible.

128. The government's actions cannot satisfy strict scrutiny.

## COUNT IV

### Violation of the National Environmental Policy Act

129. Plaintiffs incorporate by reference all preceding paragraphs.

130. The National Environmental Policy Act, 42 U.S.C. §§ 4321–4370, is designed to ensure that the government's actions are consistent with the "broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).

131. NEPA realizes its "sweeping policy goals" "through a set of 'action-forcing' procedures that require that agencies take a 'hard look at environmental consequences'" before engaging in certain projects. *Id.* at 350 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

132. The land-transfer statute instructs the government to "carry out the land exchange in accordance with the requirements of the National Environmental Policy Act" in "a single environmental impact statement." § 3003(c)(9)(A)–(B), 128 Stat. 3735.

133. By expressly incorporating NEPA, Congress indicated that the government must take a hard look at the land transfer's environmental consequences and then show its work in a

19

"reasonable and reasonably explained" EIS. *Seven Cnty. Infrastructure. Coal. v. Eagle County*, 145 S. Ct. 1497, 1511 (2025).

134. In 2023, Congress amended NEPA through the BUILDER Act, Pub. L. 118-5, Div. C, Tit. III, § 321, 137 Stat. 38–39, which sets a default rule that an EIS "shall not exceed 150 pages." 42 U.S.C. § 4336a(e)(1)(A); *accord Seven Cnty.*, 145 S. Ct. at 1512 n.3.

135. For projects of "extraordinary complexity," an EIS "shall not exceed 300 pages." 42 U.S.C. § 4336a(e)(1)(B).

136. The EIS in this case is over 1,000 pages. It also includes appendices adding approximately 1,400 more pages. Thus, the EIS exceeds NEPA's length limitation.

137. NEPA further requires that agencies "include in every recommendation or report on … major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C)(iii).

138. NEPA also requires that agencies "study, develop, and describe technically and economically feasible alternatives" to proposed plans. 42 U.S.C. § 4332(F).

139. The EIS here does not comply with NEPA's requirement to consider reasonable alternatives. Instead, the EIS admits that "alternative underground mining methods" "could physically be applied" to recover the copper without disturbing the surface of Oak Flat, but declines to even consider them based on Resolution's claim that these alternatives would have "higher operational costs" and "reduce the amount of ore that could be profitably mined." 4-EIS-F-3. The failure to consider reasonable alternatives violates NEPA.

## COUNT V

### Violation of the National Historic Preservation Act

140. Congress enacted the National Historic Preservation Act (NHPA), 54 U.S.C. §§ 300101 *et seq.*, in 1966, with the goal of identifying and protecting the nation's historical treasures.

141. The NHPA requires federal agencies to consider the impact of any undertaking on properties of historical significance, including traditional religious and cultural importance to an Indian tribe.

142. Section 106 of the NHPA requires that, prior to issuance of a federal permit or license, federal agencies shall take into consideration the effects of an "undertaking" on "historic propert[ies]." 54 U.S.C. § 306108. Agencies "must complete the section 106 process 'prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license.'" 36 C.F.R. § 800.1(c). The NHPA established the Advisory Council on Historic Preservation ("ACHP"), an independent federal agency with the primary mission to encourage historic preservation in the government and across the nation.

143. The NHPA defines undertaking as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including – (1) those carried out by or on behalf of the Federal agency; (2) those carried out with Federal financial assistance; (3) those requiring a Federal permit, license, or approval; and (4) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency." 54 U.S.C. § 300320; 36 C.F.R. § 800.16(y).

144. The NHPA Section 106 process requires federal agencies involved in undertakings to make a reasonable and good faith effort to identify and disclose historic properties within affected areas, evaluate the potential adverse effects of the federal undertaking to the historic properties, and seek ways to avoid, minimize, or mitigate any adverse effects to the historic properties. 36 C.F.R. §§ 800.4-800.6.

145. The Section 106 process requires consultation with Indian Tribes on federal undertakings that potentially affect sites that are culturally significant to Indian Tribes. 36 C.F.R. § 800.2(c)(2); 54 U.S.C. § 302706 (properties "of traditional religious and cultural importance to" a Tribe may be included on the National Register, and federal agencies "shall consult with any Indian Tribe … that attaches religious and cultural significance" to such properties).

146. If the agency finds that historic properties are affected, it must provide notification to all consulting parties and invite their views to assess adverse effects. 36 C.F.R. § 800.2(c)(2). Any adverse effects to historic properties must be resolved, involving all consulting parties and the public. *Id.* § 800.6. If adverse effects cannot be resolved, the process is elevated again to the ACHP and the head of the agency undertaking the action. *Id.* § 800.7. Until this process is complete, the action in question cannot go forward.

147. If adverse effects on historic sites are identified, the agency must continue consulting with the parties and avoid or mitigate any adverse effects.

148. If an agreement between the ACHP and the agencies cannot be reached as to a plan for mitigation, the agency "must make clear in the record that the ACHP's comments were taken seriously." *Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 265 (3d Cir. 2001).

149. The government failed to coordinate with the ACHP before it issued the first EIS in 2021.

150. In 2025, before issuing the second EIS, the government responded to the ACHP's comments suggesting mitigation efforts to preserve Oak Flat.

151. However, the agency's response failed to take seriously the ACHP's recommendations and refused to mitigate the harm to Oak Flat and other historic properties that will be destroyed by the mine. This violated the NHPA.

## COUNT VI

### Violation of the Administrative Procedure Act

152. Plaintiffs incorporate by reference all preceding paragraphs.

153. The Administrative Procedure Act (APA) requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

154. For the reasons given above, the EIS is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*

155. Accordingly, the EIS must be vacated and set aside.

156. Defendants' APA violations have caused and will continue to cause ongoing irreparable harm to Plaintiffs.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

a. Declare that the transfer and destruction of Oak Flat violates and is invalid under RFRA;

b. Declare that the transfer and destruction of Oak Flat violates and is invalid under the Free Exercise Clause of the First Amendment to the United States Constitution;

c. Declare that the Defendants' actions violate NEPA, the NHPA, the APA, other laws noted herein, and the implementing regulations and policies of these laws;

d. Issue a permanent injunction prohibiting Defendants from conveying any right, title, or interest of the United States in Oak Flat to Resolution Copper or otherwise allowing or authorizing Resolution Copper to take any action affecting the physical integrity of Oak Flat;

e. Set aside and vacate the EIS and void any actions or decisions based on the EIS;

f. Award Plaintiffs compensatory and nominal damages for the loss of their rights as protected by the United States Constitution, RFRA, and other federal laws;

g. Award Plaintiffs the costs of this action and reasonable attorneys' fees; and

h. Award such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.

[*Signature page attached*]

Respectfully submitted this 24th day of July, 2025.

/s/ Christian J. Myers
Christian J. Myers (Bar ID: 1658355)
Madeline Bergstrom*
NELSON MULLINS RILEY & SCARBOROUGH LLP
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
(202) 689-2807
josh.myers@nelsonmullins.com
madeline.bergstrom@nelsonmullins.com

    *application for admission forthcoming

Miles E. Coleman*†
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 W. Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2352
miles.coleman@nelsonmullins.com

    *application for admission pending
    †application for admission *pro hac vice* forthcoming

Jeffrey A. Wald†
NELSON MULLINS RILEY & SCARBOROUGH LLP
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
jeff.wald@nelsonmullins.com

    †application for admission *pro hac vice* forthcoming

*Counsel for Plaintiffs*