NELSON MULLINS RILEY & SCARBOROUGH LLP
Miles E. Coleman (admitted *pro hac vice*)
miles.coleman@nelsonmullins.com
2 W. Washington Street, Suite 400
Greenville, SC 29601
Telephone: (864) 373-2352
Facsimile: (864) 373-2925

Jeffrey A. Wald (application for admission *pro hac vice* pending)
jeffrey.wald@nelsonmullins.com
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
Telephone: (336) 774-3335
Facsimile: (336) 774-3299

Madeline C. Bergstrom (application for admission *pro hac vice* forthcoming)
madeline.bergstrom@nelsonmullins.com
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
Telephone: (202) 689-2807
Facsimile: (202) 689-2860

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**PHOENIX DIVISION**

GOUYEN BROWN LOPEZ, *et al.*,

Plaintiffs,

v.

UNITED STATES OF AMERICA, *et al.*,

Defendants,

and

RESOLUTION COPPER MINING, LLC,

Defendant-Intervenor.

No. 2:25-cv-02758-PHX-DWL

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

ARGUMENT ..... 1

I. Plaintiffs are likely to succeed on the merits. ..... 1

A. The government's and Resolution's "threshold issues" are meritless. ..... 1

B. The government's actions violate RFRA. ..... 6

C. The government's actions violate the Free Exercise Clause. ..... 8

D. The government's actions violate NEPA. ..... 11

1. The EIS violates NEPA's length requirement. ..... 11

2. The EIS fails to consider reasonable alternatives. ..... 13

E. The government's actions violate the NHPA. ..... 14

II. Plaintiffs satisfy the remaining preliminary injunction factors. ..... 15

A. Plaintiffs will be irreparably harmed. ..... 15

B. The public interest and balance of equities favor enjoining the land transfer. ..... 16

CONCLUSION ..... 17

CERTIFICATE OF SERVICE ..... 18

## TABLE OF AUTHORITIES

**Cases**

*'Ilio'ulaokalani Coal. v. Rumsfeld*,
464 F.3d 1083 (9th Cir. 2006) .......... 6

*Apache Stronghold v. United States*,
145 S. Ct. 1480 (2025) .......... 1

*Apache Stronghold v. United States*,
No. 21-cv-50, 2025 WL 1360694 (D. Ariz. May 9, 2025) .......... 16, 17

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .......... 16–17

*Bates v. Pakseresht*,
2025 WL 2079875 (9th Cir. July 24, 2025) .......... 11

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 2

*Bowen v. Roy*,
476 U.S. 693 (1986) .......... 10

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .......... 7, 8

*Chenault v. USPS*,
37 F.3d 535 (9th Cir. 1994) .......... 12

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 5

*Concerned Citizens All., Inc. v. Slater*,
176 F.3d 686 (3d Cir. 1999) .......... 14

*CTIA - The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) .......... 15

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) .......... 14

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) .......... 4

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) .......... 2

*Feliciano v. Dep't of Transp.*,
145 S. Ct. 1284 (2025) .......... 4

*Flynt v. Shimazu*,
940 F.3d 457 (9th Cir. 2019) .......... 4

*Foti v. McHugh*,
247 Fed. App'x. 899 (9th Cir. 2007) .......... 17

*Franciscan All., Inc. v. Azar*,
414 F. Supp. 3d 928 (N.D. Tex. 2019) .......... 7

*Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*,
252 F.3d 246 (3d Cir. 2001) .......... 14

*Friends of the Clearwater v. Dombeck*,
222 F.3d 552 (9th Cir. 2000) .......... 6

*Grand Canyon Tr. v. Elec. Power Co.*,
391 F.3d 979 (9th Cir. 2004) .......... 5

*Johnson v. State of California*,
207 F.3d 650 (9th Cir. 2000) .......... 4

*Kettle Range Conservation Grp. v. U.S. Bureau of Land Mgmt.*,
150 F.3d 1083 (9th Cir. 1998) .......... 16

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) .......... 12

*League of Wilderness Defs. v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) .......... 17

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) .......... 5

*Mahmoud v. McKnight*,
102 F.4th 191 (4th Cir. 2024) .......... 11

*Mahmoud v. Taylor*,
145 S. Ct. 2332 (2025) .......... 8, 9, 10

*Miller v. Maxwell's Int'l Inc.*,
991 F.2d 583 (9th Cir. 1993) .......... 5

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 16

*Porretti v. Dzurenda*,
11 F.4th 1037 (9th Cir. 2021) .......... 17

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
501 F.3d 1009 (9th Cir. 2007) .......... 6

*Pres. Coal., Inc. v. Pierce*,
667 F.2d 851 (9th Cir. 1982) .......... 2

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*,
128 F.4th 1089 (9th Cir. 2025) .......... 2, 3

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .......... 12–13

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) .......... 2, 15

*Save the Peaks Coal. v. U.S. Forest Serv.*,
669 F.3d 1025 (9th Cir. 2012) .......... 5–6

*Scott v. Boos*,
215 F.3d 940 (9th Cir. 2000) .......... 12

*Seven County Infra. Coal. v. Eagle County*,
145 S. Ct. 1497 (2025) .......... 1, 12

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) .......... 8

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009) .......... 13

*Tanzin v. Tanvir*,
592 U.S. 43 (2020) .......... 15

*Thomas v. County of Humboldt*,
124 F.4th 1179 (9th Cir. 2024) .......... 4

*TikTok Inc. v. Garland*,
145 S. Ct. 57 (2025) (per curiam) .......... 8

*Trout Unlimited v. Pirzadeh*,
1 F.4th 738 (9th Cir. 2021) .......... 4

*W. Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013) .......... 13

*W. Watersheds Project v. Grimm*,
921 F.3d 1141 (9th Cir. 2019) .......... 2

**Statutes**

16 U.S.C. § 539p .......... 13, 16

42 U.S.C. § 2000bb-1 .......... 7, 8

42 U.S.C. § 4332 .......... 13

42 U.S.C. § 4336a .......... 11

Carl Levin and Howard P. "Buck" McKeon National Defense
Authorization Act for Fiscal Year 2015, § 3003(c)(9)(B), 128 Stat. 3292 .......... 2, 3, 5

## INTRODUCTION

In a matter of days, the government intends to transfer a millennia-old Apache sacred site to Resolution Copper for a project that all agree will result in the site's irreparable destruction. That action will have "consequences that threaten to reverberate for generations." *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1489 (2025) (Gorsuch, J., joined by Thomas, J., dissenting from denial of certiorari). But it doesn't have to happen. As Plaintiffs' motion explains, the government's actions violate multiple sources of law that take precedence over the land-transfer statute, including RFRA and the Free Exercise Clause. Dkt.15-1 at 16–27. And the transfer statute itself requires the Forest Service to comply with procedural requirements before transferring the land—which it has not satisfied. *Id.* at 27–32.

The government's and Resolution's responses (Dkt.33, 38) do not explain why they should be allowed to forever extinguish Plaintiffs' religious exercises before Plaintiffs' claims can be adjudicated on the merits. The Court should grant a preliminary injunction.

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits.

#### A. The government's and Resolution's "threshold issues" are meritless.

Anxious to dodge the merits, Defendants first offer a grab-bag of so-called "threshold issues" with Plaintiffs' claims, Dkt.33 at 3—some at war with one another, others defying the very land-transfer statute Defendants purport to be defending, and all unavailing.

*First*, Defendants say Plaintiffs' procedural claims (NEPA and NHPA) fail because the "land exchange" isn't reviewable under the APA. Dkt.33 at 3-4; *see* Dkt.38 at 16–17. But Plaintiffs' procedural claims don't challenge "the land exchange"; they challenge the agency's *procedure* in effectuating it—*i.e.*, the adequacy of its EIS and Section 106 process. Dkt.15-1 at 27–32. This is nothing unusual; indeed, it is precisely what NEPA and NHPA are about—delineating "'the necessary process,'" not policing substantive "'results.'" *Seven County Infra. Coal. v. Eagle County*, 145 S. Ct. 1497, 1510 (2025) (NEPA);

*see Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982) (NEPA and NHPA).

*Second*, the government pivots, asserting the EIS can't be challenged because it isn't "final agency action." Dkt.33 at 8–9. But this flouts decades of precedent holding that "final NEPA documents"—like this final EIS—"are final agency actions." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 868 (9th Cir. 2022) (collecting cases). The government suggests this case is different because it hasn't yet published the final Record of Decision. Dkt.33 at 8–9. But under the transfer statute, *the EIS* "provides the agencies' final word on the environmental impacts," *Env't Def. Ctr.*, 36 F.4th at 868—Section 3003 instructs that a "single environmental impact statement" be "used as the basis for all decisions … related to the proposed mine." Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, § 3003(c)(9)(B), 128 Stat. 3735–36. And *the EIS* is the document "from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)—the EIS's publication triggers the 60-day transfer deadline. § 3003(c)(10), 128 Stat. 3736. That a final ROD is also forthcoming changes nothing: "a federal agency's assessment, plan, or decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*, 128 F.4th 1089, 1110 (9th Cir. 2025).

*Third*, Defendants say Plaintiffs' NEPA and NHPA claims are "not redressable." Dkt.33 at 4–5; Dkt.38 at 15–16. But if this Court vacates the EIS, then the transfer cannot occur until there is a new EIS—permitting Plaintiffs to continue freely worshiping at Oak Flat and avoiding the "irreparable harm" Plaintiffs will suffer for any "period[ ] of time" in which they are unable to "attend[ ] religious services" there. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19–20 (2020); *see also W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1148 (9th Cir. 2019) (possible "short term" cessation of harmful activities sufficed to make NEPA claim redressable). Further, if this Court agreed with Plaintiffs that the EIS fails to take the necessary hard look at alternative mining methods less destructive of Oak Flat, *see* Dkt.15-1 at 27–30, then future agency "decisions … related to the proposed

mine," § 3003(c)(9)(B), 128 Stat. 3735–36—like the permitting decisions necessary for Resolution to carry out its current, maximally destructive plan—"could be influenced" by that alternatives analysis, *Prutehi Litekyan*, 128 F.4th at 1106–07. Under the "relaxed" redressability standard for "procedural" claims like these, *id.* at 1106, this more than suffices. Indeed, the government itself concedes the EIS will "guid[e] … future" mine decisions on which "the Forest Service enjoys discretion." Dkt.33 at 6.

*Fourth*, the government claims "the exchange is not contingent" on "the preparation of an EIS." Dkt.33 at 5–6. But the statute is explicit: "Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under" NEPA. § 3003(c)(9)(B), 128 Stat. 3735–36. If that's not a condition precedent, it's hard to see what is. This same point defeats Defendants' theory that even a deficient EIS shouldn't result in an injunction against the transfer since the agency couldn't ultimately "disapprove" the transfer. Dkt.33 at 14 n.11; Dkt.38 at 17–18. The problem for Defendants is that *Section 3003* itself disapproves the transfer absent a NEPA-compliant EIS.

*Fifth*, in even bolder defiance of Section 3003, the government argues that it doesn't have to comply with NEPA at all because NEPA doesn't generally require environmental analysis for "an action [the agency] could not refuse to perform." Dkt.33 at 8. But even assuming this as a background rule, Section 3003 explicitly displaces it: the statute (again) requires the Secretary to prepare an EIS and (further) requires the Secretary to "carry out the land exchange in accordance with the requirements of [NEPA]." § 3003(c)(9)(A), 128 Stat. 3735. So if this Court vacates the EIS as not "in accordance with the requirements of" NEPA, then the transfer requirement won't be triggered, because there won't be an EIS—just like the government itself in 2021 concluded that it didn't have to transfer the land after it withdrew its initial EIS. Dkt.15-1 at 15–16.

Perhaps recognizing this, Defendants move on to arguing that the exchange isn't contingent on "*judicial review* of the FEIS." Dkt.33 at 6–8 (emphasis added); *see* Dkt.38 at 14–15. But Plaintiffs' claim isn't that a judge must *approve* the EIS before the transfer can

occur; it's that judicial review is *available* should a plaintiff properly seek it—consistent with the "strong presumption that Congress intends judicial review of administrative action." *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021). Grasping for a statutory hook to rebut that presumption, Defendants claim judicial review would render the statute's 60-day transfer deadline "meaningless." Dkt.33 at 7; *see* Dkt.38 at 15. But on Plaintiffs' reading, that provision is far from "surplusage"; it has obvious "work to do"—requiring transfer within 60 days of the EIS *unless a judicial order requires otherwise*. *Feliciano v. Dep't of Transp.*, 145 S. Ct. 1284, 1294 (2025). Defendants' argument is like saying that any statute with an effective date is thereby exempt from judicial review—a bizarre notion coming nowhere close to the "clear[ ] evidence[ ]" needed to demonstrate the "exception" of "non-reviewability." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 665 (9th Cir. 2021).

*Sixth*, Defendants claim Plaintiffs' RFRA and Free Exercise claims are barred by the statute of limitations because the land-transfer statute was enacted in 2014. Dkt.33 at 9–10; Dkt.38 at 6. But Defendants declined to raise this supposed problem before the Ninth Circuit or Supreme Court in *Apache Stronghold*, and for good reason—because it fails the straight-face test. For purposes of Plaintiffs' RFRA and Free Exercise claims, "the injury which is the basis of the cause of action" is the transfer and destruction of Oak Flat, *Johnson v. State of California*, 207 F.3d 650, 653 (9th Cir. 2000)—which hasn't happened yet. And it's settled law that "the statute of limitations begins to run on a claim … when a plaintiff 'knows or has reason to know of the actual injury,' not when the challenged ordinance was enacted." *Thomas v. County of Humboldt*, 124 F.4th 1179, 1191 (9th Cir. 2024); *see also Flynt v. Shimazu*, 940 F.3d 457, 462 (9th Cir. 2019) ("When the continued enforcement of a statute inflicts a continuing or repeated harm, a new claim arises (and a new limitations period commences) with each new injury.").

Indeed, Defendants themselves claim that Plaintiffs' injuries aren't even "imminent" because even the transfer won't "cut off access to all the exchanged lands." Dkt.33 at 16–

17. Plaintiffs' injuries can't possibly have *both* arisen eleven years ago *and* not yet be "immediate" enough to support an injunction. Dkt.38 at 27. Moreover, if Plaintiffs had filed this suit immediately after the transfer statute was passed, Defendants surely would have argued that it was premature, since the transfer was contingent on the actions of "independent decisionmakers," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413–14 (2013)—it would occur only "if Resolution Copper offers to convey" the "non-Federal land" involved in the transfer, § 3003(c)(1), 128 Stat. 3733, and only if the agency triggered it by publishing an EIS, after making the determination (implicit or explicit) that it didn't violate free-exercise rights. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 680–83 (2020) (agency action under statute might be arbitrary and capricious if it fails to consider RFRA).

For similar reasons, Resolution's "laches" argument (which the government does not endorse) is meritless. For one thing, Plaintiffs' claims can't be "barred by laches" (Dkt.38 at 6–7) since—as Defendants themselves emphasize—Plaintiffs' claims are governed by a statute of limitations. *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 586 (9th Cir. 1993). In any event, laches would not apply here. Plaintiffs didn't lack diligence; they filed this case just over a month after the new, thousands-of-pages-long EIS was filed, and weeks before the transfer was set to occur. *Cf. Grand Canyon Tr. v. Elec. Power Co.*, 391 F.3d 979, 988–89 (9th Cir. 2004) (no laches when the case was filed sixteen years after the project became operative). Resolution's "diligence" argument trades on a comparison with the other lawsuits challenging the transfer, which have been pending since 2021. But those cases were triggered by the 2021 EIS, which was withdrawn six weeks after it was published. 1-EIS-ES-3. Thus Plaintiffs *couldn't* have filed this lawsuit challenging the EIS anytime between March 1, 2021, and June 20, 2025—since in that period there was no EIS to challenge.

Nor can Resolution show prejudice: "In our circuit, we have … concluded that a private company's economic loss caused by delay in completing a project is irrelevant to the prejudice inquiry." *Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1033 (9th Cir.

2012). Regardless, Resolution does not identify *any* harm that is attributable to *Plaintiffs'* so-called delay, instead citing supposed harms stretching back a decade before the challenged EIS even existed. Dkt.38 at 7–8.

*Seventh*, and finally, Resolution argues that Plaintiffs' NEPA claims are "waived" because Plaintiffs' comments on the draft EIS were too "general" to "preserve" the NEPA claims raised in this lawsuit. Dkt.38 at 13–14. But the government plainly had the "opportunity to consider" Plaintiffs' concern about inadequate evaluation of less destructive alternatives, because that concern was explicitly raised by commenters and the ACHP. *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007) (issue preserved if "considered sua sponte" or "raised by someone other than the petitioning party"); *cf. Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558–59 (9th Cir. 2000) ("Compliance with NEPA is a primary duty of every federal agency" not "depend[ent] on the vigilance and limited resources of environmental plaintiffs"). The ACHP insisted that the Forest Service "reassess[ ] … alternative and more sustainable mining techniques in an effort to prevent subsidence at Oak Flat, including, if feasible, those techniques that were previously considered and rejected by the FS and Resolution Copper." ACHP Comments at 7; *see* Dkt.15-1 at 31–32. And as the FEIS recounts, "[s]ubstantial public comments were received" objecting to Resolution's "proposed panel caving" technique and "requesting that alternative mining techniques be considered or required," 4-EIS-F-2; *see* 6-EIS R-168–73. That is exactly the request Plaintiffs make now.

Given the government's indisputable "knowledge of the very issue that concerns Plaintiffs in this case," *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092–93 (9th Cir. 2006), it's little wonder that the government itself—the party best positioned to know what was before it during the administrative process—offers no waiver argument of its own. The Court must proceed to the merits.

**B. The government's actions violate RFRA.**

On the merits, the government's actions violate RFRA. Dkt.15-1 at 16–23. Defendants

offer no response to Justices Gorsuch and Thomas's persuasive criticism of *Apache Stronghold*'s substantial-burden holding—underscoring that that ruling should be rejected by the Ninth Circuit or Supreme Court. Instead, Resolution (but not the government) attempts to claim that the mine satisfies strict scrutiny. Dkt.38 at 11–13.

That effort fails. For one thing, RFRA's strict-scrutiny "exception" by its terms applies "only if" the "*Government*" "demonstrates that application of the burden" advances a "compelling *governmental* interest" in the least restrictive way. 42 U.S.C. § 2000bb-1(b) (emphases added). Resolution is not the government, and under the plain text of RFRA "Intervenors cannot carry [the government's] burden" for it. *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 943–44 (N.D. Tex. 2019); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 721 (2014) (refusing to "entertain" strict-scrutiny arguments raised by third parties; "we do not even know what the Government's position might be with respect to" this "intensely empirical argument").

This aside, Resolution's argument also fails on its own terms. On compelling interest, Resolution says the U.S. "now produces only half of the copper it needs." Dkt.38 at 12. But that's not the same as saying there's a shortfall of copper; to the contrary, as the U.S. Geological Survey has repeatedly emphasized, in addition to this already-significant "domestic production," the U.S. has "diverse, secure sources of supply" from "reliable trade partners." Ex.A at 62,202; Ex.B at 3; *see* Ex.C at 1 (97% of current copper imports coming from four longstanding, reliable allies: Chile, Canada, Mexico, and Peru). And while Resolution emphasizes the size of this deposit, it omits that the U.S. has "ample copper reserves" more generally. Ex.D at 1. Indeed, the Resolution deposit is—according to Resolution itself—not even "the largest porphyry copper deposit in the region." Ex.E at 148 (citing "Morenci" deposit "~175 km to the east").

More importantly, Resolution's insistence on "domestic" copper is richly ironic, since there's nothing domestic about Resolution—a foreign-owned conglomerate largely controlled by the Chinese government. Dkt.15-1 at 12 n.1. Notably, Congress and the President

have recognized the threat posed by such "foreign adversary controlled" companies, *TikTok Inc. v. Garland*, 145 S. Ct. 57, 64, 69 (2025) (per curiam), worrying specifically about "our reliance upon hostile foreign powers" for production of minerals like "copper," Ex.F at 1; *see also TikTok*, 145 S. Ct. at 69 ("China" is a "designated foreign adversary").

Moreover, even without the Resolution mine, American copper mining *already* vastly outstrips American copper refining capacity. Ex.C at 1–2. Meanwhile, China is the world's dominant copper-refining power, "control[ling] over 50% of global smelting." Ex.G at 2. So, rather than fortifying national security and domestic copper, the most likely result of the project is that American copper will be sent to a foreign adversary that is also the Nation's leading competitor in mineral refining—only to be refined abroad and (if it returns at all) re-imported at a premium. This project is therefore "orthogonal" to the interests Resolution says it's meant to advance. *Singh v. Berger*, 56 F.4th 88, 105 (D.C. Cir. 2022).

As for least restrictive means, Resolution can't deny that Resolution's preferred mining technique will obliterate Oak Flat even while other technically feasible techniques would reduce impacts on the site. Dkt.15-1 at 23. Instead, Resolution notes that at least the project doesn't obliterate *other* "parcels" of land. Dkt.38 at 12–13. This is a head fake: what matters isn't whether one could imagine other, more restrictive (of something) projects, but whether *this* project is the *least* restrictive one with respect to *the plaintiff's religious exercise*. 42 U.S.C. § 2000bb-1(b)(2). Because the government's own analysis demonstrates it is not, the government cannot satisfy the "exceptionally demanding" "least-restrictive-means standard." *Hobby Lobby*, 573 U.S. at 728.

**C. The government's actions violate the Free Exercise Clause.**

Plaintiffs have also triggered strict scrutiny under the Free Exercise Clause as interpreted by *Mahmoud*. Dkt.15-1 at 24–25. *Mahmoud* holds that a burden on parents' free-exercise rights exists when government actions present an "objective danger" to their ability "to raise their children in a way that is consistent with their religious beliefs and practices." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2351 (2025). And where such a Free Exercise

burden is present, courts "need not ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny." *Id.* at 2361.

In response, the government says Plaintiffs' free-exercise claims have been "exhaustively litigated in" *Apache Stronghold*. Dkt.33 at 11. But with respect to Plaintiffs' *Mahmoud* claim, this isn't even possible; *Apache Stronghold* was decided *before* *Mahmoud*. Indeed, *no* court has addressed a free-exercise claim under *Mahmoud* in a case challenging the Resolution land transfer, in this District or otherwise.

And *Mahmoud* is fully applicable here. In fact, in contrast with the "subtle" LGBTQ message of storybooks at issue in *Mahmoud*, Dkt.15-1 at 25, the government's actions here will *eliminate* the parent Plaintiffs' ability to provide their children with the unique spiritual connection and religious practices that are available only at Oak Flat. *See, e.g.*, Dkt.15-3 ¶ 15; Dkt.15-5 ¶¶ 16, 19–20. Their daughters will not be able to hold religious ceremonies signifying their transition to Apache women. They will forever lose the special connection to the White Painted Woman, who the Apache religion teaches came from the ground at Oak Flat. Dkt.15-2 ¶¶ 20–21, 23; Dkt.15-3 ¶ 20; *see also* Dkt.15-5 ¶ 13. They will lose access to the Ga'an that reside there and the special connection to the creator, Usen, that exists only there. *See* Dkt.15-2 ¶ 28; Dkt.15-5 ¶ 7; Dkt.15-3 ¶¶ 19–20. For Gouyen and V.K., coming of age at Oak Flat is when their Apache faith came alive. Dkt.15-5 ¶ 14; *see also* Dkt.15-2 ¶ 21 ("When I opened my eyes after I was painted, I saw the world differently. My ceremony was a transformational moment in my life."). But Angela and Sinetta fear that their younger daughters will not have that opportunity. Without that experience, they will be unable to pass their faith and religious practices on to their children. This undoubtedly poses "a very real threat of undermining the religious beliefs and practices the parent wishes to instill in the child." *Mahmoud*, 145 S. Ct. at 2356 (internal quotation marks removed).

Remarkably, neither the government nor Resolution disputes the key point under *Mahmoud*—that the destruction of Oak Flat will burden Plaintiffs' ability to instill their

religious beliefs and practices in their children. *See generally* Dkt.33 at 11–12; Dkt.38 at 9–11. Instead, Resolution claims that the *Mahmoud* Court "repeated the settled rule that the government's disposition of its property … is an 'internal affair[]'" supposedly exempt from the Free Exercise Clause. Dkt.38 at 10. But the Court did no such thing; it described "internal affairs" as actions "akin to the administration of Social Security or the selection of 'filing cabinets.'" *Mahmoud*, 145 S. Ct. at 2357 (quoting *Bowen v. Roy*, 476 U.S. 693, 700 (1986)). The action at issue here—a land exchange with a multinational corporation for the purpose of building a mine that will implode Oak Flat into a crater—is not akin to those actions. And indeed, *Mahmoud* could *not* have said that disposition of government property fell into some "internal affairs" exception, since that category would cover *Mahmoud* itself—a case about how the government managed its property (public schools).

Rather, in distinguishing *Lyng*, the Court held *Mahmoud* "implicates direct, coercive interactions between the State and its young residents." *Id.* So too here—where the government is threatening to turn Plaintiffs' children into trespassers should Plaintiffs attempt to pass on their ancestral faith by introducing their children into ceremonies at Oak Flat. Indeed, just as, in *Mahmoud*, "many parents cannot afford" the "substitute" that would allow them to avoid the burden there (private school), 145 S. Ct. at 2359, here, there is no "substitute" for Apache parents like Plaintiffs at all—Oak Flat is the "birthplace of [Western Apache] religion," "the direct corridor to the Creator," and the site of essential religious ceremonies that cannot be replicated elsewhere. Dkt.15-1 at 4–5.

Resolution next claims "*Mahmoud* reflects an 'exception'" for the "unique" context of "public schools." Dkt.38 at 10. But this argument is refuted by *Mahmoud* itself, which holds that the doctrine it applies is not a "special exception" but "a principle of general applicability"—one implicated whenever government action "would 'substantially interfer[e] with'" or "pose 'a very real threat of undermining'" the "religious beliefs and practices that the parents wish to instill in their children." 145 S. Ct. at 2357–58, 2361. And indeed, the Ninth Circuit's first case citing *Mahmoud* applied it not in public schools but

in a case about access to adoption, *Bates v. Pakseresht*, 2025 WL 2079875, at *7, 13, 17, 20 (9th Cir. July 24, 2025)—with the majority rejecting a similar effort by the dissent to narrowly cabin the decision, *see id.* at *37 n.10 (Clifton, J., dissenting) (distinguishing *Mahmoud* on the ground that the plaintiff "seeks … to take the *state's* children").

Nor, as Resolution claims, did *Mahmoud* embrace some kind of "cognizab[ility]" threshold. Dkt.38 at 10. Indeed, *Mahmoud* rejected such a formula. Much like the Ninth Circuit in *Apache Stronghold*, the Fourth Circuit in *Mahmoud* had rejected the burden there not as insubstantial but as "not … cognizable." *See Mahmoud v. McKnight*, 102 F.4th 191 208–14 (4th Cir. 2024). But the Supreme Court recognized no such distinction and contemplated no such separate cognizability analysis. There is no discussion of "cognizable" burdens in the Court's opinion.

*Mahmoud* requires strict scrutiny. The land transfer fails this review. *Supra* pp.7–8.[1]

**D. The government's actions violate NEPA.**

**1. The EIS violates NEPA's length requirement.**

Neither Defendants nor Resolution dispute that the 2,400-page EIS far exceeds NEPA's page limit (150 pages generally or 300 pages in "extraordinary" circumstances). Dkt.15-1 at 28; *compare* Dkt.12 at 14–15 (EIS "comprise[s] thousands of pages in total"). Instead, they argue the page limit doesn't apply or its violation is harmless. Wrong on both counts.

*First*, Defendants and Resolution assert the page limit doesn't apply to "NEPA reviews" that started before 2023. Dkt.33 at 13; Dkt.38 at 18. But the statute regulates "environmental impact statement[s]," 42 U.S.C. § 4336a(e)(1), not "NEPA reviews"; and it does not exempt an EIS published two years after the statute took effect no matter how long ago the project was under review.

Defendants' argument to the contrary is based on a supposed presumption against

---

[1] Plaintiffs preserve their separate neutrality and general-applicability free-exercise arguments for appeal and maintain both that *Apache Stronghold* was both wrongly decided and that its reasoning was subsequently undermined by *Mahmoud*.

"retroactivity." Dkt.33 at 13. But as an initial matter, NEPA's page limit is "procedural," so "a presumption *in favor* of retroactive application attaches." *Chenault v. USPS*, 37 F.3d 535, 538 (9th Cir. 1994) (emphasis added). More importantly, even if the limitation were substantive (which Defendants themselves insist it is not, Dkt.33 at 12; Dkt.38 at 15), there would be no retroactivity problem. That is because the conduct Plaintiffs seek to apply the statute to—the issuance of the EIS—occurred *after* the page-limit statute was enacted, not before it. A statute has an impermissible retroactive effect when it strips individuals of "an opportunity to know what the law is and conform their conduct accordingly." *Scott v. Boos*, 215 F.3d 940, 943 (9th Cir. 2000) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994)). But the government here does not claim it lacked knowledge of or ability to abide by the (by-then-two-year-old) page-limit law at the time they published the EIS in 2025. Nor do they cite a single case supporting their implication, Dkt.33 at 12, that taking nearly a decade to issue the EIS gave the government a free pass from satisfying any new statutory requirements enacted during that period. In fact, *Seven County* supports the opposite: Although the Court explained that Congress "prohibits an agency's EIS from going on endlessly," it did not hold the government to the requirement because NEPA was amended "two years after the Board *issued* its final EIS"—not after it merely started *preparing* to issue one. 145 S. Ct. at 1512 n.3 (emphases altered).

*Second*, the government's blatant violation of the page limit injures Plaintiffs. Despite Defendants' repeated invocation of Congress's wisdom and will throughout the remainder of their arguments, here respect for Congress's judgment is suddenly absent. But as the Justices recognized in *Seven County*, the length limitation "strongly reinforces the basic principles that NEPA, correctly interpreted, already embodied but that have been too often overlooked," *id.* at 1512 & n.3, including "rendering the agency publicly accountable for environmental harms it decides to tolerate," *id.* at 1521 (Sotomayor, J., concurring in judgment). By giving Plaintiffs only 60 days to digest and challenge the content of a flood-the-zone EIS, Defendants failed to follow NEPA's "action-forcing procedures" and effectively

stripped Plaintiffs of their right to receive "assurance that the agency has indeed considered environmental concerns in its decisionmaking process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (internal quotation marks omitted). Hindering Plaintiffs from understanding the contents of the EIS (and then arguing they took too long to sue) is far more than a procedural injury "*in vacuo*" like that in *Summers v. Earth Island Institute*, 555 U.S. 488, 494–97 (2009) (no standing where plaintiff's "concrete interest" had been remedied through prior settlement); *cf.* Dkt.33 at 13.

**2. The EIS fails to consider reasonable alternatives.**

Despite being overlength, the EIS is also underdeveloped. Rather than addressing all "reasonable" alternatives, 42 U.S.C. § 4332(C)(iii), (F), (H), the EIS addresses only the mining method Defendants and Resolution consider most profitable. Dkt.15-1 at 28–30.

A "reasonable" alternative is one that advances the purpose of a government project. *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1046 (9th Cir. 2013). As the statute indicates, Congress's purpose for the land-transfer statute was "to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States." 16 U.S.C. § 539p(a). And the exchange itself was intended to make the land "available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership." *Id.* § 539p(c)(8). But Congress said nothing about *how much* copper the project should produce. Nor was the intent to maximize Resolution's bottom line. In fact, Congress's express concern was not about Resolution, but the Indian tribes, whose harm the government is required to seek to minimize. *See id.* § 539p(c)(3), (g)(5).

That harm was addressed by comments showing that backfill-compatible mining methods like sub-level stoping would not only reduce environmental damages, but also result in Resolution mining plenty of copper. For example, Dr. David Chambers, on behalf of the Center for Science in Public Participation, submitted a report advocating for the Forest Service's consideration of "[a] backfill-compatible underground mining method [that]

would allow preservation of environmental and social values predicted to be lost due to subsidence, would not sterilize part of the remaining mineral resource, would mine the ore body more efficiently, and would provide more jobs over a longer term to the local economy." Ex.H at 1; *see* 6-EIS-R-73. As he explained, considering these methods would not be infeasible: "For the operators of a large, rich, ore body to take into account a multitude of significant environmental and social resource losses that can be prevented by conducting responsible mining instead of maximizing economic profit, which will have little long-term benefit in the area of the mine, is not too much for a responsible land manager, like the US Forest Service, to require." Ex.H at 7–8.

Yet, Defendants suggest that consideration of any mining method that could reduce Resolution's profit is indeed too much for NEPA to require. They are wrong. Given that these mining methods fulfill Congress's purpose of producing copper, they were "reasonable alternatives" the EIS was required to consider. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 994 (9th Cir. 2025) (citation omitted). The EIS's failure to complete a reasonable-alternatives analysis—"the 'heart' of the EIS," *id.* at 990—is a clear violation of NEPA and requires vacatur.

**E. The government's actions violate the NHPA.**

Under the NHPA, the government must "consider" the comments of the Advisory Council on Historic Preservation and demonstrate that those comments were "taken seriously." *Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 265 (3d Cir. 2001). It failed to do so. At a minimum, the government is required to "demonstrate[e] that it has read and considered those recommendations." *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 696 (3d Cir. 1999). But the government's response to the ACHP here does not meet even that basic procedural requirement. The government's Section 106 project was thus nakedly deficient under the NHPA. Dkt.15-1 at 30–32.

In comments made after the initial EIS was published (without the ACHP's approval), the ACHP suggested that the USDA make efforts to "avoid adverse effects"—in particular

by engaging in "reassessment of alternative and more sustainable mining techniques in an effort to prevent subsidence at Oak Flat, including, if feasible, those techniques that were previously considered and rejected by the FS and Resolution Copper." ACHP Comments at 7; Dkt.15-1 at 30–32. But the USDA's response did not mention alternative mining techniques or explain whether it had reassessed more sustainable mining techniques. Dkt.33-1 at 4–5. And the EIS shows definitively that the government did *not* conduct the suggested reassessment: The analysis of alternative mining techniques is from 2020, before the ACHP's 2021 comments. 4-EIS-F-3–F-4.

Neither the government nor Resolution address this particular deficiency at all. *Cf.* Dkt.33 at 14–16. Indeed, Resolution's NHPA argument largely reads like it was written for a different case—attacking Plaintiffs' standing to raise a "tribal-consultation" claim that they do not make. *Cf.* Dkt.38 at 23. Resolution does note that the USDA was "'not obligated to give the ACHP's opinion so much weight that it is foreclosed from making its own decision.'" Dkt.38 at 25. But Plaintiffs' argument isn't that the USDA had to accept the ACHP's suggestion, but that it had to show it considered it. Before the government destroys a millennia-old sacred site the importance of which "cannot be overstated," ACHP Comments at 5, it should have to take seriously the ACHP's suggestion to give further consideration to alternate mining techniques that would not result in cratering Oak Flat.

## II. Plaintiffs satisfy the remaining preliminary injunction factors.

### A. Plaintiffs will be irreparably harmed.

"[I]rreparable harm is relatively easy to establish in a First Amendment case," *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). And "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn*, 592 U.S. 14, 19 (2020). That's also true for RFRA violations, as "RFRA secures Congress' view of the right to free exercise under the First Amendment." *Tanzin v. Tanvir*, 592 U.S. 43, 45 (2020).

As explained, the government's actions violate RFRA and the Free Exercise Clause, so

Plaintiffs have established irreparable harm. Regardless, it is "undisputed" that Plaintiffs will be irreparably harmed "if the transfer goes forward and Resolution Copper's mining plans are effectuated." *Apache Stronghold v. United States*, No. 21-cv-50, 2025 WL 1360694, at *6 (D. Ariz. May 9, 2025). As the EIS admits, the impact on tribal resources from the project will be "immediate, permanent, and large in scale." 3-EIS-892; *see also* 2-EIS-837 (harm will be "permanent[ ]," "irreversible," and "irretrievable").

The government and Resolution's assurances of tribal access to the Oak Flat *Campground* do not solve the problem. That "commitment" is not legally binding, and Resolution's "duty" to maintain access to the Oak Flat Campground is entirely contingent upon its "discretionary determination that access is 'practicable' and 'consistent with health and safety requirements.'" *Apache Stronghold*, 2025 WL 1360694, at *6 (quoting 16 U.S.C. § 539p(i)(3)). Moreover, the government and Resolution fail to note that the "Oak Flat campground … represents only a small portion of Oak Flat and [maintaining access] would not reduce the impact on Tribal cultural heritage caused by the destruction of the broader landscape due to the subsidence area." 3-EIS-890.

Additionally, the impending transfer will immediately make Oak Flat "private property" that is "no longer … subject to [federal law] or Forest Service management that provides for tribal access." 3-EIS-871. This will make restrictions on access to Oak Flat and the Apache religious practices "harder or impossible to challenge." *Apache Stronghold*, 2025 WL 1360694, at *6 (internal quotation marks omitted); *see also Kettle Range Conservation Grp. v. U.S. Bureau of Land Mgmt.*, 150 F.3d 1083, 1087 (9th Cir. 1998) (holding that once public lands are transferred, it may be "impractical to attempt to unscramble the eggs"). That is irreparable harm.

**B. The public interest and balance of equities favor enjoining the land transfer.**

When the government is the defendant, the public interest and equities "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And here, an Apache sacred site will be permanently destroyed, so the public interest and balance of equities point "sharply" in Plaintiffs' favor.

*Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023).

The government confines its analysis of these factors to a conclusory footnote, thereby waiving the issue. *Foti v. McHugh*, 247 Fed. App'x. 899, 901 n.2 (9th Cir. 2007). And Resolution conflates its own private economic interest with the public interest. Dkt.38 at 29. The public interest, however, "mostly concerns the injunction's impact on nonparties rather than parties." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) (internal quotation marks omitted). Any economic investments that Resolution made "in anticipation of a transfer it hopes will still occur" were merely the result of its own "voluntary choice." *Apache Stronghold*, 2025 WL 1360694, at *7; *see also* Injunction Hearing at 49, *Apache Stronghold*, 2025 WL 1360694 (Victoria Peacey confirming that Resolution Copper began incurring costs "a long time before [it] actually had a right to the land").

Regardless, granting an injunction would only delay mining until Plaintiffs have had a fair chance to litigate their claims. If the transfer is upheld, Resolution would eventually be able to mine every ounce of copper it seeks to mine. But if preliminary relief is not granted, it "could result in the permanent loss of Apaches' legal rights to access their ancestral sacred site." *Apache Stronghold*, 2025 WL 1360694, at *8 (cleaned up). Thus, at this stage, the balance of equities favors Plaintiffs "because the harms they face are permanent, while the intervenors face temporary delay." *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014).

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be granted.

Dated: August 11, 2025

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s/ Miles E. Coleman
Miles E. Coleman (admitted *pro hac vice*)
miles.coleman@nelsonmullins.com
2 W. Washington Street, Suite 400
Greenville, SC 29601
Telephone: (864) 373-2352
Facsimile: (864) 373-2925

Jeffrey A. Wald
(application for admission *pro hac vice* pending)
jeffrey.wald@nelsonmullins.com
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
Telephone: (336) 774-3335
Facsimile: (336) 774-3299

Madeline C. Bergstrom
(application for admission *pro hac vice* forthcoming)
madeline.bergstrom@nelsonmullins.com
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
Telephone: (202) 689-2807
Facsimile: (202) 689-2860

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 11, 2025, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants.

/s/ Miles E. Coleman