**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Gouyen Brown Lopez, et al.,

            Plaintiffs,

v.

United States of America, et al.,

            Defendants.

No. CV-25-02758-PHX-DWL

**ORDER**

Pending before the Court are Plaintiffs' motion for a preliminary injunction (Doc. 15) and Plaintiffs' emergency motion for an injunction pending appeal (Doc. 43). For the reasons that follow, both motions are denied.

## RELEVANT BACKGROUND

I.    <u>Overview Of SALECA</u>

In 2014, as part of the National Defense Authorization Act for Fiscal Year 2015 ("NDAA"), Congress enacted the Southeast Arizona Land Exchange and Conservation Act ("SALECA"). SALECA authorizes the exchange of 2,422 acres of federal land in the Tonto National Forest for land held by a private company, Resolution Copper ("Resolution Copper"). The federal land to be transferred to Resolution Copper includes an Apache ceremonial ground called *Chí'chil Biłdagoteel*. That area, known in English as Oak Flat, "is a site of great spiritual value to the Western Apache Indians, who believe that it is indispensable to their religious worship," but "also sits atop the world's third-largest deposit of copper ore." *Apache Stronghold v. United States*, 101 F.4th 1036, 1044 (9th

Cir. 2024) (en banc).  Congress's intent in authorizing the land exchange was "[t]o take advantage of that deposit" by enabling Resolution Copper to "mine the ore."  *Id.*

Under SALECA, the United States Forest Service ("Forest Service") must prepare an environmental impact statement "[p]rior to conveying Federal land," and the Forest Service must then convey that land to Resolution Copper "[n]ot later than 60 days after publication."  16 U.S.C. § 539p(c)(9)(B), (c)(10).

On January 15, 2021, the Forest Service published what was, at the time, the final environmental impact statement ("FEIS").  Thus, under SALECA, the land exchange was required to occur within the next 60 days, *i.e.*, by March 16, 2021.

II.    The Three Earlier Lawsuits Challenging The Land Exchange

In early 2021, three sets of plaintiffs filed lawsuits in the District of Arizona, each seeking a preliminary injunction to preclude the land exchange from going forward.

A.    ***Apache Stronghold***

In the first-filed action,  *Apache Stronghold v. United States et al.*, No. 21-cv-50-PHX-SPL (hereinafter, "*Apache Stronghold*"), the plaintiff—a nonprofit organization formed to preserve and protect American Indian sacred sites—alleged that the land exchange would violate the rights of members of the San Carlos Apache Tribe ("the Tribe") under the First Amendment's Free Exercise Clause, the Religious Freedom Restoration Act ("RFRA"), and an 1852 treaty between the United States and the Tribe.  The procedural history of *Apache Stronghold* is complex, but the relevant developments are as follows.

On February 12, 2021, Judge Logan denied the plaintiff's motion for a preliminary injunction, concluding that the plaintiff had not established a likelihood of success or even serious questions going to the merits of its claims.  (*Apache Stronghold*, Doc. 57.)  The plaintiff appealed, and on February 22, 2021, Judge Logan denied the plaintiff's motion for an injunction or stay pending appeal.  (*Apache Stronghold*, Doc. 64.)

On March 1, 2025—only 15 days before the 60-day transfer deadline was to expire—the Forest Service rescinded the FEIS.  (*Apache Stronghold*, Doc. 80 at 1 n.1.)  As a result, on March 5, 2021, the Ninth Circuit motions panel (over the dissent of Judge

1    Bumatay) denied the plaintiff's emergency motion for an injunction pending appeal,
2    concluding that the request was "premature" in light of the recission of the FEIS. *Apache*
3    *Stronghold v. United States*, 2021 WL 12295173, *1 (9th Cir. 2021).

4        On June 24, 2022, the Ninth Circuit three-judge merits panel (over the dissent of
5    Judge Berzon) affirmed the denial of the motion for a preliminary injunction, agreeing with
6    Judge Logan that the plaintiff was unlikely to succeed on its RFRA, Free Exercise, and
7    treaty-based claims. *Apache Stronghold v. United States*, 38 F.4th 742 (9th Cir. 2022).
8    However, the Ninth Circuit then voted to rehear the case *en banc*.

9        On May 14, 2024, the *en banc* court issued an amended 6-5 decision that again
10   affirmed the denial of the motion for a preliminary injunction due to the plaintiff's failure
11   to establish a likelihood of success on the merits. *Apache Stronghold v. United States*, 101
12   F.4th 1036 (9th Cir. 2024) (en banc).

13       On May 27, 2025, the Supreme Court (over the dissent of Justices Gorsuch and
14   Thomas) denied the plaintiff's petition for certiorari. *Apache Stronghold v. United States*,
15   145 S. Ct. 1480 (2025).

16       On June 23, 2025, the plaintiff filed a petition for rehearing with the Supreme Court,
17   arguing that the Court should defer ruling on the petition for certiorari pending the issuance
18   of the Court's decision in *Mahmoud v. Taylor*.

19       On June 27, 2025, the Supreme Court decided *Mahmoud v. Taylor*, 145 S. Ct. 2332
20   (2025).

21       On July 3, 2025, Plaintiff filed a supplemental brief seeking a GVR (*i.e.*, grant,
22   vacate, and remand order) in light of *Mahmoud*.

23       As of today, August 17, 2025, the Supreme Court has not taken action on those
24   requests.[1]

25       …

26       …

27   _____

28   [1]    The Supreme Court docket contains links to the recent filings identified above. https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/24-291.html.

B.    *San Carlos* **And** *AMRC*

The other two actions filed in 2021 were *San Carlos Apache Tribe v. United States Forest Service et al.*, No. 21-cv-68-PHX-DWL (hereinafter, "*San Carlos*"), and *Arizona Mining Reform Coalition v. United States Forest Service et al.*, No. 21-cv-122-PHX-DWL (hereinafter, "*AMRC*").  Both actions were eventually assigned to the undersigned judge.

In each action, the plaintiffs filed a motion for a preliminary injunction in early 2021 but then withdrew the motion based on the March 1, 2021 recission of the FEIS.  (*San Carlos*, Docs. 29, 42; *AMRC*, Docs. 9, 29.)  Both cases were then stayed pending the reissuance of the FEIS.  (*San Carlos*, Doc. 47; *AMRC*, Doc. 35.)

On June 20, 2025, the Forest Service published a new version of the FEIS.  Thus, under SALECA, the land exchange must occur within the next 60 days, *i.e.*, by August 19, 2025.  16 U.S.C. § 539(c)(10).  For reasons that are unnecessary to detail here, the Court issued an order precluding the Forest Service from proceeding with the land exchange until the very last day of that period, August 19, 2025.  (*San Carlos*, Doc. 99; *AMRC*, Doc. 81.)

Following the publication of the new FEIS, the plaintiffs in *San Carlos* and *AMRC* filed amended complaints and new motions for a preliminary injunction.  (*San Carlos*, Docs. 104, 105; *AMRC*, Docs. 86, 87.)  Presumably in light of the developments in *Apache Stronghold*, those motions did not raise any RFRA, Free Exercise, or treaty-based claims.  Instead, the claims underlying those motions fell into the following four categories:

• Appraisal Claims:  Under SALECA, the Forest Service must perform an appraisal to calculate the value of the federal and non-federal land to be exchanged.  16 U.S.C. § 539p(c)(4).  SALECA also creates an "equalization process" providing that if the federal land is more valuable than the non-federal land, Resolution Copper must make up the difference by conveying additional land and/or "mak[ing] a cash payment."  *Id.* § 539p(c)(5)(B)(i).  AMRC argued that the Forest Service violated its appraisal-related duties under SALECA by failing to account for the value of the copper deposits underlying one of the federal parcels to be exchanged, known as the Mining Claim Zone ("MCZ") parcel—an omission that, according to AMRC, resulted in the Forest Service "low-

1    ball[ing] the appraised value" of that parcel by potentially billions of dollars.  (*AMRC*, Doc.

2    97 at 10.)

3    • <u>NEPA Claims</u>: SALECA provides that "[p]rior to conveying Federal land under

4    this section, the Secretary [of Agriculture] shall prepare a single environmental impact

5    statement under the National Environmental Policy Act of 1969 ['NEPA'], which shall be

6    used as the basis for all decisions under Federal law related to the proposed mine and the

7    Resolution mine plan of operations and any related major Federal actions significantly

8    affecting the quality of the human environment, including the granting of any permits,

9    rights-of-way, or approvals for the construction of associated power, water, transportation,

10   processing, tailings, waste disposal, or other ancillary facilities."   16 U.S.C.

11   § 539p(c)(9)(B).  In their motions, AMRC and the Tribe identified an array of perceived

12   NEPA-related shortcomings and omissions in the FEIS.

13   • <u>Consultation Claims</u>:  SALECA provides that "[t]he Secretary shall engage in

14   government-to-government consultation with affected Indian tribes concerning issues of

15   concern to the affected Indian tribes related to the land exchange."   16 U.S.C.

16   § 539p(c)(3)(A).  Additionally, under section 106 of the National Historic Preservation Act

17   ("NHPA"), agencies "shall take into account the effect of an undertaking on any historic

18   property" and afford the Advisory Council on Historic Preservation ("ACHP") "a

19   reasonable opportunity to comment with regard to the undertaking."  *Tohono O'odham*

20   *Nation v. U.S. Dept. of the Interior*, 138 F.4th 1189, 1193 (9th Cir. 2025) (cleaned up).  In

21   its motion, the Tribe argued that the Forest Service did not fulfill these consultation duties

22   before publishing the FEIS.

23   • <u>NFMA Claims</u>:  The National Forest Management Act ("NFMA") includes a

24   provision that requires the Forest Service to prepare a land and resource management plan

25   for each national forest. 16 U.S.C. § 1604(a).  Such a plan exists for the Tonto National

26   Forest (the "Forest Plan") and was last amended in 2023.  In the FEIS, the Forest Service

27   acknowledges that some of the contemplated mining-related activities will occur within the

28   Tonto National Forest and thus require an amendment of the Forest Plan (*San Carlos*, Doc.

105-9 at 11, 54), and the draft record of decision ("DROD") proposes 16 amendments to the Forest Plan that would be required for approving Skunk Camp as the preferred tailings storage facility alternative (*AMRC*, Doc. 87-3 at 19-25). In its motion, AMRC argued that this approach violates NFMA's forest planning regulations, which appear at 36 C.F.R. Part 219, because those regulations require a public notice-and-comment process "which did not occur here" before any forest plan may be amended. (*AMRC*, Doc. 87 at 28.)

On August 6, 2025, soon after the preliminary injunction motions became fully briefed, the Court held a lengthy motion hearing in *San Carlos* and *AMRC*.

On August 15, 2025, the Court issued a 94-page order (hereinafter, "the August 15, 2025 order") denying both preliminary injunction motions. (*San Carlos*, Doc. 124; *AMRC*, Doc. 99.) The August 15, 2025 order also specified that that the Court would deny the plaintiffs' requests for an injunction pending appeal. (*Id.*)

That same day, both sets of plaintiffs filed interlocutory appeals. (*San Carlos*, Doc. 125; *AMRC*, Doc. 100.)

III.    This Action

On July 24, 2025, Plaintiffs initiated this action in the United States District Court for the District of Columbia. (Doc. 1.)

On July 25, 2025, there was a flurry of activity. Among other things, the Federal Defendants moved to transfer this action to the District of Arizona (Doc. 7), Resolution Copper moved to intervene (Doc. 10) and filed a separate transfer request (Doc. 12), and Plaintiffs moved for a preliminary injunction (Doc. 15).

On August 1, 2025, Judge Kelly granted Resolution Copper's intervention request, set a briefing schedule on the preliminary injunction motion (with Defendants' responses due by August 5, 2025 and Plaintiffs' reply due by August 11, 2025), and granted Defendants' transfer requests. In the memorandum explaining the transfer decision, Judge Kelly noted, among other things, that Plaintiffs' conduct "raises the specter of forum-shopping" because the Ninth Circuit's decision in *Apache Stronghold* "would appear to doom many of their First Amendment and RFRA claims." (Doc. 28 at 6.)

1    On August 5, 2025, after the transfer was processed, the undersigned held a

2    telephonic status conference with the parties. (Doc. 34.) Among other things, the Court

3    authorized the parties to file oversized briefs and explained that "because many of the

4    matters in this case seem to overlap with some of the arguments that are already being

5    raised in the two cases that are previously before me that I'll be having the [preliminary

6    injunction] hearing tomorrow in, it's not entirely clear to me that we're going to need to

7    hold a separate hearing in this case. . . . I'm obviously going to be hard at work after the

8    hearing tomorrow working on the order in the other two cases. It seems to me that by the

9    time the reply comes in on this case on August 11th, I'll have a much better sense on

10   whether an additional hearing is needed. So I'd be inclined to not schedule a hearing at

11   this time . . . ."[2]

## DISCUSSION

13   The issues raised here overlap significantly with the issues raised in the preliminary

14   injunction briefing in *San Carlos* and *AMRC*. In the interest of brevity, the Court thus

15   incorporates, by reference, the analysis set forth in the August 15, 2025 order concerning

16   the applicable standards, the unique features of SALECA, and the complexities raised by

17   Defendants' jurisdictional and threshold challenges.

18   I.    The First *Winter* Factor

19   As discussed in the August 15, 2025 order, the first *Winter* factor addresses whether

20   Plaintiffs have shown a likelihood of success on the merits or at least serious questions

21   going to the merits.

22        A.    **RFRA And Free Exercise Claims**

23   Plaintiffs' first argument is that they are likely to succeed on a RFRA-based

24   challenge to the land exchange. (Doc. 15-1 at 16-23.) Plaintiffs' supporting arguments

25   rest on the premise that "the en banc majority's" RFRA analysis in *Apache Stronghold* was

_____

27   [2]    To that end, the Court had hoped to finalize and issue this order by August 15, 2025, concurrently with the order in *San Carlos* and *AMRC*, and made substantial efforts to do so. Unfortunately, due to the complexity and sheer volume of the number of issues raised in those two cases and in this case, the finalization of this order took some extra time.

wrong.  (*Id.*)  Likewise, in their reply, Plaintiffs cite "Justices Gorsuch and Thomas's persuasive criticism of *Apache Stronghold*'s substantial-burden holding" and argue that *Apache Stronghold*'s RFRA analysis "should be rejected by the Ninth Circuit or the Supreme Court."  (Doc. 40 at 6-7.)

Whatever force those arguments may have had when this action was pending in the District of Columbia (and thus governed by the law of the D.C. Circuit), they are unavailing now that it has been transferred to the District of Arizona (and thus governed by the law of the Ninth Circuit).  In *Apache Stronghold*, the Ninth Circuit rejected—albeit by a narrow margin—a RFRA-based challenge to the land exchange that is effectively the same as the RFRA-based challenge being advanced here.  It may be true, as Plaintiffs emphasize, that "six federal appellate judges and two Supreme Court Justices" have disagreed with the majority's RFRA analysis (Doc. 15-1 at 19), but it still represents the law of the Ninth Circuit.  Accordingly, it is binding here.  *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981) ("District courts are bound by the law of their own circuit . . . no matter how egregiously in error they may feel their own circuit to be.").

Plaintiffs' second argument is that they are likely to succeed on a challenge under the Free Exercise Clause.  (Doc. 15-1 at 24-27.)  This argument is once again foreclosed by Ninth Circuit law, as *Apache Stronghold* held—albeit once again by a slim margin— that the plaintiff had "no likelihood of success on its Free Exercise claim."  *Apache Stronghold*, 101 F.4th at 1055.  In support, the court cited "the Supreme Court's controlling decision in" *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. (1988).  *Id.* at 1049.  The court concluded that "[t]he project challenged here is indistinguishable from that in *Lyng*."  *Id.* at 1051.

In their reply, Plaintiffs contend that *Apache Stronghold*'s Free Exercise analysis is no longer good law in light of the Supreme Court's subsequent decision in *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025).  (Doc. 40 at 9-11.)  Plaintiffs are unlikely to succeed on this argument.  In the Ninth Circuit, "a district court or a three-judge panel" is only "free to reexamine the holding of a prior panel in light of an inconsistent decision by a court of

last resort" when "the relevant court of last resort [has] undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc). As Defendants correctly point out (Doc. 33 at 11-12; Doc. 38 at 9-11), *Mahmoud* likely does not satisfy this demanding "clearly irreconcilable" standard for a host of reasons, including that *Mahmoud* did not purport to overrule or limit *Lyng*. *Mahmoud*, 145 S. Ct. at 2356-57 ("We are also unpersuaded by the Board's reliance . . . on our decisions in [*Bowen*] and *Lyng* . . . . These cases have no application here.").[3]

Given these conclusions, it is unnecessary to address Defendants' other bases for challenging Plaintiffs' RFRA and Free Exercise claims. In light of *Apache Stronghold*, Plaintiffs have not established a likelihood of success on those claims or even serious questions going to the merits of those claims.

B.    **NEPA Claims**

Plaintiffs' third argument is that the FEIS "violates NEPA in two respects: (1) it exceeds NEPA's clear length limit; and (2) it fails to comply with NEPA's requirement to consider reasonable alternatives." (Doc. 15-1 at 28.)

1.    Page Limit

As a threshold matter, although the Court concluded in the August 15, 2025 order that none of the NEPA-related challenges in *San Carlos* and *AMRC* were likely to satisfy the "final agency action" requirement, the analysis as to Plaintiffs' page-limit challenge may be different. The Forest Service has now made a final decision regarding the length of the FEIS, and that particular decision is not tentative or subject to revision in the final record of decision ("ROD").

Nevertheless, Plaintiffs are unlikely to succeed on the merits of their page-limit challenge. As background, in 2023, as part of the Building U.S. Infrastructure through

---

[3] As noted in earlier portions of this order, there is a pending GVR request before the Supreme Court in *Apache Stronghold* that is premised on *Mahmoud*. This Court obviously expresses no opinion on how the Supreme Court will or should resolve that request and confines its analysis to the limited "clearly irreconcilable" inquiry contemplated by *Miller*.

Limited Delays & Efficient Reviews ("BUILDER") Act, Congress amended NEPA in various ways. One of the new provisions enacted as part of the BUILDER Act provides as follows:

> (e) **Page Limits**
>
> > (1) **Environmental impact statements**
> >
> > > (A) **In general**
> > >
> > > Except as provided in subparagraph (B), an environmental impact statement shall not exceed 150 pages, not including any citations or appendices.
> > >
> > > (B) **Extraordinary complexity**
> > >
> > > An environmental impact statement for a proposed agency action of extraordinary complexity shall not exceed 300 pages, not including any citations or appendices.

42 U.S.C. § 4336a(e). Recently, the Supreme Court cited this provision when explaining that "federal law now *strictly* prohibits an agency's EIS from going on endlessly." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 1512 n.3 (2025).

Plaintiffs contend the FEIS violates § 4336a(e) because it includes 1,010 pages of substantive text, not including appendices. (Doc. 15-1 at 28.) Defendants respond that § 4336a(e) is inapplicable because the FEIS preparation-process began long before § 4336a(e) was enacted and statutes ordinarily apply only prospectively. (Doc. 33 at 12-13; Doc. 38 at 18-19.) Resolution Copper further notes that, under the Department of Agriculture's regulations, the new procedural limitations enacted as part of the BUILDER Act only apply to new projects or projects in the early stage of development: "USDA subcomponents also have the discretion to begin applying the USDA NEPA regulations, as revised, effective immediately upon publication of this interim final rule where it makes sense to do so for new proposals and applications, or for existing proposals or applications that are in the early stages of the applicable NEPA process and can easily transition to using the revised USDA NEPA regulations." 90 Fed. Reg. 29,632, 29,644 (July 3, 2025).

It is unclear whether § 4336a(e) applies here. Although the canon against

retroactivity is likely inapplicable for the reasons identified in Plaintiffs' reply—as Plaintiffs note, "if a provision is . . . procedural, a presumption in favor of retroactive application attaches," *Chenault v. USPS*, 37 F.3d 535, 538 (9th Cir. 1994)—it must not be overlooked that the unique form of FEIS required by SALECA differs from the sort of FEIS ordinarily contemplated by NEPA.  As discussed in more detail in the August 15, 2025 order, SALECA expressly required the Forest Service to address certain topics in the FEIS in addition to environmental consequences.   16 U.S.C. § 539p(c)(9)(C) ("The environmental impact statement prepared under subparagraph (B) shall . . . assess the effects of the mining and related activities on the Federal land conveyed to Resolution Copper under this section on the cultural and archeological resources that may be located on the Federal land; and . . . identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources, if any.").  The Ninth Circuit has recognized that the FEIS required by SALECA is thus more expansive than an ordinary FEIS: "*Congress supplemented the ordinary NEPA requirements for such statements* and required that the EIS for the land transfer also 'assess the effect of the mining' on 'cultural and archeological resources' in the area and 'identify measures . . . to minimize potential adverse impacts on those resources.'"  *Apache Stronghold*, 101 F.4th at 1047 (emphasis added).  If SALECA requires the Forest Service to prepare a FEIS that covers additional topics beyond the topics ordinarily addressed in a FEIS, it stands to reason that the usual page limits applicable to FEISs may not be applicable here.[4]

Yet even assuming that the page limits specified in § 4336a(e) applied and that the Forest Service violated those limits, the Court agrees with the Federal Defendants' assertion that Plaintiffs likely cannot show "they were injured by receiving more information than they were otherwise entitled to."  (Doc. 33 at 13.)  "The APA directs us to take due account of the rule of prejudicial error. . . .  The harmless-error analysis asks whether the [agency's failure] materially impeded NEPA's goals—that is, whether the

---

[4]     In a related vein, SALECA places a qualification on the Forest Service's obligation to "carry out the land exchange in accordance with [NEPA]," providing that this obligation is "[e]xcept as otherwise provided in this section."  16 U.S.C. § 539p(c)(9)(A).

error caused the agency not to be fully aware of the environmental consequences of the proposed action, thereby precluding informed decisionmaking and public participation, or otherwise materially affected the substance of the agency's decision." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016). *See also Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 527 (9th Cir. 1994), *as amended on denial of reh'g* (1994) ("In determining whether NEPA has been violated, we must look to the ultimate harm NEPA seeks to prevent: the risk of damage to the environment that results if the agency fails to properly and thoroughly evaluate the environmental impacts of a proposed project.").

In *Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy*, 860 F.3d 1244 (9th Cir. 2017), the plaintiffs sought a preliminary injunction to stop the Navy from building an "explosives handling wharf" for maintenance of submarines and nuclear missiles. *Id.* at 1248-49. "[T]he Navy prepared and published an EIS," which "[a]t several points . . . referenced appendices." *Id.* However, "[t]hree of these appendices were redacted in their entirety in the publicly released version of the EIS." *Id.* During litigation, the appendices were later disclosed, but the initial "failure to disclose the . . . appendix information violated NEPA," which requires "disclosure to the fullest extent possible." *Id.* at 1252 (cleaned up). "Nevertheless," the Ninth Circuit concluded that "the Navy's failure to disclose the portions of the appendices at issue was harmless error" because the plaintiffs had "not specified any information in the now-revealed portions of [the appendices] that would have made a difference in agency decisionmaking or public participation" or otherwise "demonstrated that NEPA's goals were materially impeded." *Id.* at 1253.

Here, too, Plaintiffs have not demonstrated how the publishing of a shorter FEIS would have made a difference in the agency decisionmaking or otherwise impede NEPA's goals. Plaintiffs argue that the overly-long FEIS caused harm by "giving [them] only 60 days to digest and challenge the content of a flood-the-zone EIS" and "effectively stripp[ing] [them] of their right to receive 'assurance that the agency has indeed considered environmental concerns in its decisionmaking process.'" (Doc. 40 at 12-13.) To support this argument, Plaintiffs cite *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332

1

2

(1989).  The full quote from *Robertson* reads:

3

> Publication of an EIS, both in draft and final form, also serves a larger informational role.  It gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process and, perhaps more significantly, provides a springboard for public comment. Thus, in this case the final draft of the Early Winters Study reflects not only the work of the Forest Service itself, but also the critical views of the Washington State Department of Game, the Methow Valley Citizens Council, and Friends of the Earth, as well as many others, to whom copies of the draft Study were circulated.

4

5

6

7

8

9

*Id.* at 349 (cleaned up).

10

11

12

13

14

Although *Robertson* broadly supports the notion that NEPA's purpose is to facilitate "public participation," it does not support Plaintiffs' argument that NEPA is intended to expedite and enable emergency litigation.  Instead, *Robertson* suggests that the type of "public participation" envisioned by NEPA is public access to information and "public comment."  In this case, the Forest Service provided both.[5]

15

16

17

It is also important to take stock of other provisions of the BUILDER Act, passed alongside the new page limits, when assessing how those page limits intersect with NEPA's broader goals and purposes.  For example, the new § 4336a(g) provides that:

18

19

(1)    **In general**

20

Except as provided in paragraph (2), with respect to a proposed agency action, a lead agency shall complete, as applicable—

21

22

(A)    the environmental impact statement not later than the date that is 2 years after the sooner of, as applicable—

23

24

(i)    the   date   on   which   such   agency   determines   that   section

25

26

27

28

[5]    Further, as Resolution Copper points out: "Plaintiffs' assertion that the lengthy EIS is too long for the public to tackle . . . ignores the 32 page executive summary that captures the essence of the entire study."  (Doc. 38 at 19.)  This argument also supports a finding of harmless error.  Despite the voluminous nature of the FEIS, Plaintiffs here (as well as the plaintiffs in *San Carlos* and *AMRC*) were still able to seek relief and the Court was still able to review their challenges within the 60-day statutory window.  Plaintiffs' contrary argument places form over function and fails to explain how a 300-page EIS with 3,000 pages of appendices—as permitted by the statute—would be materially different from the document provided here.

4332(2)(C) of this title requires the issuance of an environmental impact statement with respect to such action;

(ii)   the date on which such agency notifies the applicant that the application to establish a right-of-way for such action is complete; and

(iii)   the date on which such agency issues a notice of intent to prepare the environmental impact statement for such action; and

. . .

(2)   **Delay**

A lead agency that determines it is not able to meet the deadline described in paragraph (1) may extend such deadline, in consultation with the applicant, to establish a new deadline that provides only so much additional time as is necessary to complete such environmental impact statement or environmental assessment.

42 U.S.C. § 4336a(g).  This provision suggests the new page limits are part of a broader effort to *expedite* the EIS process.  *Seven County Infrastructure Coalition*, 145 S. Ct. at 1512 n.3 ("Under that BUILDER Act, an EIS shall not exceed 150 pages and must be completed in 2 years or less.  That Act strongly reinforces the basic principles that NEPA, correctly interpreted, already embodied but that have been too often overlooked.") (cleaned up).  The remedy that Plaintiffs seek here—vacating the FEIS so the Forest Service can craft a new version of that document that is simply shorter in length—would not advance that goal.

For these reasons, Plaintiffs are unlikely to succeed on their page-limit challenge.

2.    Alternative Mining Methods

The other alleged NEPA violation raised by Plaintiffs is that the FEIS "neglected to study, develop, and describe . . . the technically and economically feasible alternatives to turning Oak Flat into a crater."  (Doc. 15-1 at 28, cleaned up.)  More specifically, Plaintiffs fault the Forest Service for uncritically accepting Resolution Copper's proposed mining method without considering and analyzing alternative mining methods that might be less destructive.  (*Id.* at 28-30.)  Plaintiffs also contend the FEIS is internally inconsistent on

- 14 -

1   why the Forest Service accepted this mining method, stating at times that the decision was

2   intended to boost Resolution Copper's profits and productivity but stating at other times

3   that the agency "did not factor profitability into the analysis." (*Id.*)

4        This challenge is unlikely to succeed on the merits. As an initial matter, the Federal

5   Defendants argue that because the Forest Service lacks authority to regulate the mining

6   operations that will occur on private land following the land exchange, the Forest Service

7   was not required to provide any analysis in the FEIS of the environmental consequences

8   of the mining methods that Resolution Copper may use as part of those operations or any

9   analysis of alternative mining methods. (Doc. 33 at 13.) Plaintiffs' reply does not appear

10  to address or dispute this point. *Seven County Infrastructure Coalition*, 145 S. Ct. at 1516

11  ("[A]gencies are not required to analyze the effects of projects over which they do not

12  exercise regulatory authority."). The Forest Service also emphasized this point in the

13  DROD. (*AMRC*, Doc. 94-2 at 16 [DROD page 5: "Mining operations within the area

14  conveyed by the Forest Service in the exchange are not subject to regulation by the Forest

15  Service . . . .].)

16       Moreover, even if the Forest Service's evaluation of alternative mining methods

17  could somehow affect the Forest Service's discretionary decisions as to other matters (such

18  as decisions regarding pipelines, permits, and the like), the Forest Service still has not made

19  any final decisions regarding those matters, which will eventually be set forth in the ROD.

20  As a result, any challenge along those lines would likely fail based on the absence of "final

21  agency action," as explained in more detail in the August 15, 2025 order.

22       Finally, putting aside those obstacles, Plaintiffs' substantive criticisms of the

23  portions of the FEIS discussing alternative mining methods[6] are unlikely to succeed on the

24  merits. In the FEIS, the Forest Service explained that it had "received detailed comments

25  on our assessment of alternative mining techniques other than block caving; the most

26  commonly noted was cut-and-fill mining. . . . Ultimately, we confirmed our decision to

27

_____

[6]      Although the Forest Service may not have been required, for the reasons stated
28  above, to assess the environmental consequences of alternative mining methods, it still
    chose to do so.

- 15 -

dismiss alternative mining techniques from detailed analysis.  Almost all industry mining guidance indicates alternative mining techniques are not appropriate for a deposit like the Resolution Copper deposit, and the trade-offs are unreasonable.  However, we added further description here due to the interest in this topic."  (*San Carlos*, Doc. 105-9 at 95 [FEIS page 50.].)  The Forest Service continued:

> Based on review of industry guidance for selection of mining methods, block caving is the standard mining method used in the industry for ore bodies with the grade, size, depth, and geological characteristics of the Resolution Copper deposit.  The ore and host rock characteristics that are favorable to other underground techniques differ from the Resolution Copper deposit.  While physically almost any technique could be undertaken, it is unlikely that any of these other underground techniques would be chosen as a reasonable technique for a similar deposit.
>
> Aside from appropriateness when compared to industry standards, use of any of these alternative underground mining techniques would result in higher per-ton mining costs, and as a result the cutoff grade for the deposit would need to be higher to be economically feasible.  An increase in the cutoff grade from 1 percent to 2 percent removes an estimated 80 percent of the tonnage of the Resolution Copper deposit from consideration for development.  The tonnage is likely to be even lower at a 2 percent cutoff grade, as many of these areas of high-grade ore are not contiguous or continuous.  We found that accepting this level of reduction to accommodate an alternative mining technique is not economically feasible and would be unreasonable.
>
> Based on public comments, the primary misunderstanding is that the decision not to analyze alternative mining techniques is based on profit, and that we are prioritizing profitability over environmental protection.  This is not the case.  Analysis of profitability of the mine was not conducted, and does not factor into the NEPA analysis or the determination of alternatives.  Rather, our decision is based on what is reasonable under regulations and policy.  We found that forgoing 80 percent of the ore deposit to accommodate an alternative mining technique is an unreasonable outcome.

(*Id.* at 95-96 [FEIS pages 50-51].)

In Appendix F to the FEIS, the Forest Service provided further technical analysis of these topics.  (*San Carlos*, Doc. 107-3 at 224-27 [FEIS pages F-2 through F-5.].)  That analysis cross-referenced and discussed various studies, including the "Resolution Copper

1   Project and Land Exchange Environmental Impact Statement Final Alternatives Evaluation
2   Report (SWCA Environmental Consultants 20l7a)."  (*Id.* at 225 [FEIS page F-3].)
3          For these reasons, it is evident that the Forest Service took the sort of "hard look"
4   at alternative mining methods that, to the extent any such analysis was even required here,
5   would be sufficient under NEPA.  Although Plaintiffs may disagree with the Forest
6   Service's conclusions regarding the feasibility of those alternative mining methods,
7   "[b]lack-letter administrative law instructs that when an agency makes those kinds of . . .
8   predictive or scientific judgments, and decides what qualifies as . . . feasible or the like, a
9   reviewing court must be at its 'most deferential.'"  *Seven County Infrastructure Coalition*,
10  145 S. Ct. at 1512.  Courts must also resist the urge to "fly-speck" the agency's analysis
11  and "act[] as a type of omnipotent scientist."  *Audubon Society of Portland v. Haaland*, 240
12  F.4th 967, 984 (9th Cir. 2022).  In a related vein, it fell within NEPA's "broad zone of
13  reasonableness," *Seven County Infrastructure Coalition*, 145 S. Ct. at 1513, for the Forest
14  Service to consider the cost and productivity of the alternative mining methods when
15  assessing their feasibility.  Such consideration was particularly reasonable here because
16  Congress indicated in SALECA that it expected the land exchange to result in "the
17  extraction of minerals in commercial quantities by Resolution Copper."  16 U.S.C.
18  § 539p(c)(9)(D)(ii).  Plaintiffs may be correct that "Congress said nothing about *how much*
19  copper the project should provide" and did not "inten[d] to maximize Resolution's bottom
20  line" (Doc. 40 at 13), but it was still reasonable for the Forest Service to consider, as part
21  of the feasibility analysis, the cost and productivity of alternative mining methods and how
22  those considerations would affect the mine's output and productivity.  *Cf. Robertson*, 490
23  U.S. at 350-51 ("If the adverse environmental effects of the proposed action are adequately
24  identified and evaluated, the agency is not constrained by NEPA from deciding that other
25  values outweigh the environmental costs.  In this case, for example, it would not have
26  violated NEPA if the Forest Service, after complying with the Act's procedural
27  prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy
28  Butte justified the issuance of a special use permit, notwithstanding the loss of 15 percent,

1    50 percent, or even 100 percent of the mule deer herd.").

2          C.    **Consultation Claim**

3          Plaintiffs' final argument is that the Forest Service violated its consultation duties

4    under § 106 of NHPA by failing to address certain mitigation measures proposed by ACHP,

5    including "the specific suggestion of incentivizing alternate mining techniques that would

6    prevent the crater from destroying the land at Oak Flat." (Doc. 15-1 at 30-32.)

7          Plaintiffs are unlikely to succeed on this claim. As discussed in the August 15, 2025

8    order, the Forest Service consulted extensively with ACHP before ACHP terminated the

9    consultations in February 2021. The Secretary of Agriculture also provided a detailed

10   written response in April 2025 to the post-termination comments that ACHP transmitted

11   in March 2021.

12         Plaintiffs focus on ACHP's second comment, which encouraged the Department of

13   Agriculture to "use further discussions with Indian tribes and other stakeholders to develop

14   and evaluate alternatives and further modifications to the undertaking that might avoid

15   adverse effects while also pursuing additional steps to modify or prevent the land transfer"

16   and then identified several areas of recommended emphasis, including "a reassessment of

17   alternative and more sustainable mining techniques in an effort to prevent subsidence at

18   Oak Flat." (*San Carlos*, Doc. 109-5 at 8.) In the portion of the April 2025 letter responding

19   to ACHP's second comment, the Secretary of Agriculture provided four lengthy, single-

20   spaced paragraphs. (*San Carlos*, Doc. 82-15 at 3-4.) The final paragraph reads: "It is also

21   important to recognize that SALECA limits the authority the USDA will have over most

22   elements of the proposed Resolution Copper Mine (RCM) because once the land is

23   exchanged, the project will be almost entirely on private land." (*Id.* at 4.) Read in proper

24   context, this is a response to ACHP's earlier comment about pursuing alternative mining

25   methods—as discussed in the preceding section of this order, the Forest Service lacks

26   authority to compel Resolution Copper to utilize a particular mining method once the land

27   exchange is completed.

28         As discussed in greater detail in the August 15, 2025 order, it follows that the Forest

1    Service likely did all that is required under § 106: it "demonstrate[d]" via the April 2025
2    letter that "it ha[d] read and considered" ACHP's comments and "gave the ACHP's
3    conclusion genuine attention."  *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 696
4    (3d Cir. 1999).

5    II.    The Remaining *Winter* Factors

6          The remainder of the preliminary injunction analysis mirrors the analysis set forth
7    in Parts II, III, and IV of the August 15, 2025 order, which is incorporated by reference
8    here.  More specifically, (1) the analysis need not go any further in light of Plaintiffs' failure
9    to satisfy the first *Winter* factor; and (2) even if Plaintiffs had established serious questions
10   going to the merits, the Court would deny injunctive relief based on the remaining *Winter*
11   factors—although Plaintiffs will suffer irreparable harm in the absence of a preliminary
12   injunction, the public interest does not tip sharply in their favor (nor does the balance of
13   equities).

14   III.    Request For Injunction Pending Appeal

15         Plaintiffs' alternative request for an injunction pending appeal (Doc. 43) is denied
16   for the same reasons as the requests for an injunction pending appeal in *San Carlos* and
17   *AMRC* (as discussed in Part V of the August 15, 2025 order).  Although this is an important
18   case of an unusual magnitude, involves sympathetic Plaintiffs, and raises some compelling
19   equities, the Court does not construe Rule 62(d) as authorizing an injunction pending
20   appeal absent a stronger showing on the merits.  For similar reasons, the Court is
21   unpersuaded that it would be appropriate to "enter a limited, 14-day stay . . . to give the
22   Ninth Circuit an opportunity to address Plaintiffs' request for an emergency injunction on
23   a less time-compressed time schedule."  (Doc. 43 at 2.)  Granting that relief would
24   effectively be granting a TRO, and the standard for granting a TRO is simply not met here.

25         It is unfortunate that Plaintiffs will have very little time to seek emergency relief
26   from the Ninth Circuit before the land exchange is scheduled to occur on August 19, 2025
27   (and the judges of the Ninth Circuit will have even less time to consider that request), but
28   the Court has made extensive efforts to resolve the oversized preliminary injunction motion

in this case (as well as the two oversized motions in *San Carlos* and *AMRC*) as expeditiously as possible so there is at least some period of time for the Ninth Circuit to consider these issues.

Accordingly,

**IT IS ORDERED** that:

1.    Plaintiffs' motion for preliminary injunction (Doc. 15) is **denied**.

2.    Plaintiffs' motion for an injunction pending appeal (Doc. 43) is **denied**.

Dated this 17th day of August, 2025.

Dominic W. Lanza
United States District Judge